MARY JORDAN, CARMINE RUSSO, FRANK DE GAETANO, JAMES F. MURPHY, ARTHUR J. CACCESE AND ELIZABETH CACCESE, HIS WIFE, FRANK A. DUFFIELD AND ALBERT FLORIO, JR., INDIVIDUALLY AND ON BEHALF OF ALL SIMILARLY SITUATED OWNERS AND TRAINERS OF RACING HORSES IN THE STATE OF NEW JERSEY, PLAINTIFFS-APPELLANTS, v. HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION, DEFENDANT-RESPONDENT.

Argued March 9, 1982—Decided July 27, 1982.

*Frederick A. Jacob* argued the cause for appellants.

*Dennis O. Dowd* argued the cause for respondent (*Dowd & Dowd*, attorneys).

*Mary Jane Cooper*, Deputy Attorney General, argued the cause for *amicus curiae* New Jersey Racing Commission (*Irwin I. Kimmelman*, Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

POLLOCK, J.

This appeal raises the question whether the statutory designation of the New Jersey Horsemen's Benevolent and Protective Association (NJHBPA) to receive up to 2.5% of the purse money from thoroughbred horseracing in New Jersey violates state constitutional prohibitions against special laws. The Chancery Division concluded that the special law provisions of the New Jersey Constitution had not been violated. We granted direct certification, 88 *N.J.* 500 (1981), and now modify and affirm.

I

Plaintiffs are owners of thoroughbred racehorses that run at New Jersey tracks. Defendant, the Horsemen's Benevolent and Protective Association (HBPA), is a national nonprofit organization which serves both as a charity aiding the racehorse industry and as a representative of owners, trainers, and other personnel in dealings with racetracks. HBPA was incorporated in Rhode Island, has its principal place of business in Maryland and is divided into 26 regional divisions, one of which is NJHBPA.

Each of the regional divisions, including NJHBPA, is bound by HBPA's national constitution and bylaws and may not unilaterally change its procedures or benefits to meet local needs. The national board, which has the power to suspend or expel any member, determines the assessments to be paid by each of the regional divisions to finance HBPA.

Any licensed owner or trainer is eligible for membership in HBPA and, unless expressly declining membership in writing, automatically becomes a member by starting a thoroughbred horse in a qualifying race. Members of the national HBPA also automatically become members of each regional division in

which they start a horse. To remain a member in good standing, an owner must contribute to HBPA not less than 1% of any purse money. Moreover, a member of any regional division must be in good standing with all other regions to receive HBPA membership benefits. An owner racing horses in several states must contribute 1% or more of purses won in each state to the regional division for that state or forfeit all benefits from all regions. No New Jersey benefits would be available to any owner who raced in another state and refused to contribute to that regional division. To illustrate, an owner who races in New Jersey and New York may not contribute either to the New Jersey region or to the New York region, but must contribute to both.

In most regions, HBPA members sign prepared cards authorizing the tracks to deduct the required 1% contribution directly from each member's purse money and forward that amount directly to the regional division. Until 1975, the NJHBPA used the signature card system to collect its contribution. If any owners did not wish to become HBPA members, they simply declined to sign cards and no deductions were taken from their purses. In 1975, however, the Legislature amended the statute governing racing and provided expressly that up to "2.5% of the sum available for distribution as purse money from all parimutuel pools" be paid directly to the NJHBPA.

Prior to 1971, the statute did not expressly establish the portion of the total amount wagered at racetracks in the State that should be distributed as purse money to the owners. Predecessor statutes simply provided for a percentage allocation to the New Jersey Racing Commission. See L. 1940, c. 17, § 46 and subsequent amendments. Starting in 1971, however, the Legislature has allocated varying percentages of the betting pool to the horse owners. In 1971, the Legislature directed the tracks to pay out 3.74% of the amount wagered (after certain unrelated statutory distributions) as purse money. L. 1971, c. 159, § 1. The percentage was amended in 1974 to 8.75%, L. 1974, c. 181, § 3; to 4.24% in 1975, L. 1975, c. 327, § 2; and to a

range of 5.92% to 10.11% (depending on the volume and nature of the wagering permitted) in 1979. *L.* 1979, *c.* 94, § 2. In 1980, a new provision applicable only to the Meadowlands track imposed a range of 4.24% to 7.24% without changing the percentages at other tracks. *L.* 1980, *c.* 25, § 4.

The provision establishing the purse money percentage originally required the tracks to distribute the entire amount "as purse money," *L.* 1971, *c.* 159, § 1, but the 1974 amendment directed its distribution "as purse money and for programs designed to aid the horsemen and their representatives." *L.* 1974, *c.* 181, § 3. Those aid programs were not to exceed 3.2% of the purse money percentage. *Id.* In 1975, the Legislature designated NJHBPA as a recipient of the funds; the statute was amended to direct the amount to be distributed "as purse money and for programs designed to aid the horsemen and the New Jersey Horsemen's Benevolent and Protective Association." *L.* 1975, *c.* 327, § 2. The 1975 amendment also lowered the ceiling for aid programs to 2.9% of the purse money. The ceiling was reduced further to 2.5% in 1979, *L.* 1979, *c.* 94, § 2, where it remains to date, *N.J.S.A.* 5:5–66(b)(1)(d) and (b)(2)(d), except at the Meadowlands track where a 2.9% ceiling applies. *L.* 1980, *c.* 25, § 4, codified at *N.J.S.A.* 5:10–7.

Nothing in the legislative history indicates the reason for the designation of NJHBPA; since 1974, however, the entire allocation has been paid to NJHBPA. No other "programs designed to aid the horsemen" receive money under the statutory provisions, and no statute or regulation indicates how such programs might qualify for funding if established.

The allocation process begins with an estimate by each track of the total parimutuel wagering for a given time period. Of that total, the statutory percentage, usually 7.16%, is designated as purse money. Then 2.5% of that amount is set aside for NJHBPA, and the remainder is divided among the races to be held during the time period. Thus, for example, some $56,000 in total purse money was available for distribution in nine races at

the Atlantic City Race Course on July 16, 1980. Only $54,601 was actually paid to owners as "net" purse money; the remaining $1,399, 2.5% of $56,000, had been deducted for NJHBPA.

Although the allocation varies with wagering volume, NJHBPA receives about $600,000 or more each year. The statute does not restrict the use of the funds, and only about half of the 1979 NJHBPA budget was expended for benevolent programs. Roughly $220,000 was expended for overhead costs, including $23,620 for entertainment and $20,202 for travel. Nearly $90,000 was sent to HBPA to pay the region's share of national costs.

Plaintiffs initially sued in the United States District Court for the District of New Jersey, alleging that HBPA had not accounted for the funds, had misused pension and benevolent funds, and had violated federal anti-trust laws, as well as the United States and New Jersey Constitutions. The State of New Jersey was named as a defendant in the count alleging a conspiracy to violate the anti-trust laws, but that count was dismissed, and the Attorney General remained in the case as *amicus curiae* on the state constitutional issues. Plaintiffs moved for summary judgment, but the United States District Court abstained because the statute had never been interpreted by the state courts. *See Railroad Comm'n of Texas v. Pullman Co.*, 312 *U.S.* 496, 61 *S.Ct.* 643, 85 *L.Ed.* 971 (1941).

Accordingly, plaintiffs filed suit in the Chancery Division seeking a declaratory judgment that the designation of NJHBPA violated three provisions of the state constitution: (1) the prohibition against general laws "of a private, special or local character," *N.J.Const.* (1947), *Art.* IV, § 7, *par.* 7; (2) the prohibition against special laws "[g]ranting to any corporation, association or individual any exclusive privilege, immunity or franchise whatever," *N.J.Const.* (1947), *Art.* IV, § 7, *par.* 9(8); and (3) the prohibition against the "appropriation of money . . . by the State . . . to or for the use of any society, association or corporation whatsoever." *N.J.Const.* (1947), *Art.* VIII, § 3, *par.* 3.

In support of a motion for summary judgment, plaintiffs emphasized that the statute forced them to pay for the operation of a private organization that they did not wish to support. Plaintiff Jordan stated she wished to withdraw from membership in and support of NJHBPA. Plaintiff Florio expressed his dissatisfaction with NJHBPA and his desire "to see a rival organization formed to compete" with it. He added that it was "practically impossible" for a rival to exist given the guaranteed funding the statute affords to NJHBPA, and he estimated his own financial loss from the purse money deductions at more than $3,500 through 1980. Although defendants did not file a formal cross-motion for summary judgment, the parties agreed that the court should dispose of the case as a matter of law.

The trial court denied summary judgment for plaintiffs and dismissed the two counts of the complaint alleging that the statute was an unconstitutional special law. Furthermore, the trial court found that the third count, alleging a state appropriation to a private association, raised genuine issues of material fact requiring a trial. Plaintiffs appealed the dismissal of the first two counts and, to prevent characterization of the appeal as interlocutory, consented to the dismissal of the third count, which they do not challenge on this appeal. Thus, this appeal involves only the challenges to the statute as special legislation and not the question of appropriating public money to the use of a private organization.

## II

At the outset, we address two preliminary issues: plaintiffs' standing and the status of the Attorney General. As to standing, each plaintiff is the owner of thoroughbred racehorses that have won in races at New Jersey tracks. Therefore, plaintiffs are entitled to share in the purse money. Because the statute reduces the amount distributed as purse money, plaintiffs are directly affected.

Any slight additional private interest is sufficient to afford standing to private litigants who raise issues of great public interest, such as a constitutional challenge to a statute. *See Salorio v. Glaser*, 82 *N.J.* 482, 492 (1980) (New York residents who would not benefit directly had standing to challenge New Jersey commuter tax). The interest of these horseowners in the winnings of their horses is a sufficient additional private interest to accord them standing.

As to the role of the Attorney General, the State of New Jersey was a defendant in the federal action until dismissed. Thereafter, in the federal and state actions, the Attorney General has appeared as an *amicus curiae*. Our rule on the joinder of parties does not require that the State be named as a defendant in every action challenging the validity of a statute, but merely requires that the Attorney General be notified. *R.* 4:28–4(a). This requirement has been satisfied, and the participation of the Attorney General as an *amicus* has adequately protected the interests of the State.

### III

Broadly speaking, legislation is either general or special. *See N.J.Const.* (1947), *Art.* IV, § 7, *par.* 7. Special legislation may be constitutional if enacted for a valid purpose, *see id., par.* 9, and in accordance with the procedures required for special legislation. *Id., par.* 8; *N.J.S.A.* 1:6–1 *et seq.* Whether a law is special or general depends on the class of persons affected by the law. General legislation includes all those who should be included in the class, *Roe v. Kervick*, 42 *N.J.* 191, 233 (1964), but unconstitutional special legislation excludes some who should be included in the class. *Budd v. Hancock*, 66 *N.J.L.* 133, 135 (Sup.Ct.1901). The essence of unconstitutional special legislation is the arbitrary exclusion of someone from the class. In considering whether legislation is general or special, the Court must make three determinations: (1) the purpose and subject matter of the statute; (2) whether any persons are

excluded who should be included; and (3) whether the classification is reasonable, given the purpose of the statute. *Vreeland v. Byrne*, 72 *N.J.* 292, 298–301 (1977).

■ Moreover, we are mindful that a statute is presumed to be constitutional and that a court should exercise sparingly the power to declare a statute unconstitutional. *Paul Kimball Hosp. v. Brick Tp. Hosp.*, 86 *N.J.* 429, 447 (1981); *Harvey v. Essex Cty. Bd. of Freeholders*, 30 *N.J.* 381, 388 (1959); *Gangemi v. Barry*, 25 *N.J.* 1, 10–11 (1957). Bearing in mind the presumption of constitutionality, the judicial task is to decide "whether there is any conceivable state of facts bearing a reasonable relation to the object of the act which affords a basis for the classification." *Robson v. Rodriquez*, 26 *N.J.* 517, 524 (1958).

Thus constrained, we proceed to examine the statutory scheme in light of the constitutional restriction concerning special laws. The relevant provision states: "No general law shall embrace any provision of a private, special or local character." *Art.* IV, § 7, *par.* 7. Additionally, "[t]he Legislature shall not pass any private, special or local laws: ... [g]ranting to any corporation, association or individual any exclusive privilege, immunity or franchise whatever." *Art.* IV, § 7, *par.* 9(8).

■ The vice in special laws is that they foster favoritism. The purpose of the constitutional prohibitions is to prevent abuse of the legislative process by picking favorites. 2 Sutherland, *Statutory Construction* § 40.01 at 135 (4th ed. 1973). In effect, the prohibitions eliminate the invidious threat of unfair preferences and restrict the legislative power to grant favors to some at the expense of others. *Van Riper v. Parsons*, 40 *N.J.L.* 1, 9 (Sup.Ct.1878).

HBPA argues that, by funding NJHBPA and its benevolent programs, the act furthers the statutory purpose, which is to aid New Jersey horsemen. Furthermore, HBPA asserts that no other group exists to claim entitlement to the funds and, therefore, no one is excluded who should be included.

 We agree that the apparent purpose of the legislation is to provide for the welfare of horsemen, and not HBPA. Moreover, we recognize that a direct benefit to HBPA, as alleged in the dismissed third count of the complaint, would violate the constitutional prohibition against the appropriation of monies for a private association. *N.J.Const.* (1947), *Art.* VIII, § 3, *par.* 3. *See Roe v. Kervick, supra,* 42 *N.J.* at 216–22; *Wilentz v. Hendrickson,* 133 *N.J.Eq.* 447, 464 (Ch.1943), aff'd, 135 *N.J.Eq.* 244 (E. & A.1944). Thus, the question is not, as HBPA contends, whether any other horsemen's organization exists which claims a share of the allocation, but whether the effect of the statute is to exclude any New Jersey horsemen whom the Legislature intended to benefit.

 Because of HBPA rules, the effect of the statute is to restrict benefits to HBPA members in good standing but to require all horsemen, even those who are not members, to contribute to NJHBPA. For example, Mary Jordan has demanded that she be allowed to withdraw from membership in NJHBPA. Through the operation of the statute, however, she must contribute to NJHBPA. Non-members also include anyone who has lost membership because of a refusal to contribute "voluntarily" to other HBPA regional divisions or because of a suspension or expulsion imposed by the national HBPA. Because the object of the statute is to benefit all horsemen, the distinction in allocating benefits between members and non-members of HBPA bears no rational relationship to any legitimate public purpose. All owners who race horses in New Jersey are compelled to finance NJHBPA through the mandatory deduction from their purse money, but the rules of HBPA deny benefits to owners who are not in good standing outside of New Jersey. No conceivable state of facts justifies the denial of benefits to horsemen who are required to pay an assessment because of the operation of the statute but are denied benefits because of a refusal to pay dues outside New Jersey or because of the commission of some other violation of HBPA rules. Thus, we find it would be irrational to exclude those non-members

who are New Jersey horsemen from the benefits accorded to members of NJHBPA.

Furthermore, given the structure of the statutory system, NJHBPA clearly enjoys certain advantages. It need not account for the funds save by filing an annual financial statement with the New Jersey Racing Commission and the State Treasurer. *N.J.S.A.* 5:5–92. A similar lack of accountability and public control resulted in the invalidation of an analogous statutory scheme in Florida. *HBPA, Florida Div. v. Division of Pari-Mutuel Wagering*, 397 *So.*2d 692 (Fla.1981). In that case, HBPA, as plaintiff, successfully challenged a Florida statute that required thoroughbred horseracing licensees to pay 1% of purse money to a competitive organization. It would be ironical for HBPA to challenge successfully the Florida statute because of lack of accountability and to benefit from a comparable statutory scheme in New Jersey.

The statute, however, is reasonably susceptible to a construction that will free it from the constitutional defects. *See State v. Profaci*, 56 *N.J.* 346, 350 (1970). In an area subject to pervasive legislative control, we believe that the Legislature would prefer that the statute survive with appropriate modifications rather than succumb to constitutional infirmities. *New Jersey State Chamber of Commerce v. New Jersey Election Law Enforcement Comm'n*, 82 *N.J.* 57, 75 (1980); *State v. DeSantis*, 65 *N.J.* 462, 473 (1974); *Schmoll v. Creecy*, 54 *N.J.* 194, 202 (1969). Consequently, we hold that the HBPA rules must yield to the legislative purpose of aiding racing personnel. That is, NJHBPA may not, on the basis of membership, deny New Jersey horsemen the right to participate in the benevolent programs financed by the statutory allotment.

Additionally, we construe the statute to impose restrictions upon NJHBPA's use of allocated funds. The sole statutory provision dealing with accountability, *N.J.S.A.* 5:5–92, merely provides that NJHBPA must file an annual audited financial statement with the State Treasurer and the Racing

Commission for their review. Although the statute does not specify the nature of that review, we hold that it must be sufficient to insure that the statutory allocation is used to finance benevolent programs and the administrative and overhead costs reasonably related to those programs. The statute may not be used to obtain funds to finance NJHBPA or HBPA except insofar as those organizations fulfill the statutory purpose of caring for New Jersey horsemen on a non-discriminatory basis.

Although the designation of NJHBPA as a recipient of funds accords that organization an advantage, that advantage is not, on the face of the statute, tantamount to an exclusive privilege under *N.J.Const.* (1947), *Art.* IV, § 7, *par.* 9(8). The statute does not limit distribution of the allocation to NJHBPA. Other organizations may design programs to aid the horsemen and request funds for those programs. NJHBPA has no preordained right to all or any of the funds except insofar as it undertakes to fulfill the statutory purpose of aiding the horsemen.

As a means of funding programs to benefit those employed in thoroughbred racing in New Jersey, the statute is constitutional. If as applied, however, the statute does not achieve its intended purpose, then it would be vulnerable to challenge. The Legislature has directed the Commission and the State Treasurer to review audited financial statements of NJHBPA. On this facial challenge to the statute, we assume that the Commission and the Treasurer will perform their statutory obligations to scrutinize the expenditures of NJHBPA, particularly those for overhead, including entertainment and travel, as well as dues paid to HBPA. If it appears that the statute is being used to advance private interests under the guise of general welfare, judicial intervention would be justified. *See Reingold v. Harper*, 6 *N.J.* 182, 192 (1951). Furthermore, the rights and privileges granted to NJHBPA are subject to the sovereign power of the Legislature which, if it concludes

that NJHBPA is not fulfilling its assigned duties, may end the arrangement.

Thus construed, no intended beneficiary is excluded irrationally from the benefits of the statute and no undue or exclusive privilege is granted to NJHBPA. Consequently, the statute does not violate *Art.* IV, § 7, *par.* 7 or *par.* 9(8) of *N.J.Const.* (1947).

We modify and affirm the judgment of the Chancery Division.

For modification and affirmance—Justices PASHMAN, CLIFFORD, SCHREIBER, HANDLER, POLLOCK and O'HERN—6.

For reversal—None.