HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION, NEW JERSEY DIVISION, PLAINTIFF-RESPONDENT AND CROSS-APPELLANT, v. ATLANTIC CITY RACING ASSOCIATION, DEFENDANT-APPELLANT AND CROSS-RESPONDENT.

Argued October 10, 1984—Decided February 14, 1985.

446 

*David M. Satz, Jr.*, argued the cause for appellant and cross-respondent (*Saiber, Schlesinger, Satz & Goldstein*, attorneys; *David J. D'Aloia*, on the briefs).

*Dennis O. Dowd* argued the cause for respondent and cross-appellant (*Dowd & Dowd*, attorneys).

*Joel H. Sterns* argued the cause for *amicus curiae* Standard-bred Breeders and Owners Association of New Jersey, Inc. (*Sterns, Herbert & Weinroth*, attorneys; *Simon Kimmelman* and *Richard M. Hluchan*, on the brief).

The opinion of the Court was delivered by

POLLOCK, J.

The Horsemen's Benevolent & Protective Association, New Jersey Division (NJHBPA) sued the Atlantic City Racing Association (ACRA) for money allegedly due from the 1978 and 1979 racing seasons and for equitable relief that it no longer seeks. The basis of the claim for money is *N.J.S.A.* 5:5–66, which authorizes payments by racetracks to NJHBPA from purse money won by horse owners. ACRA asserted, among other defenses, that the statute constitutes special legislation in violation of *N.J. Const.* of 1947, art. IV, § 7, paras. 7, 9(8), an illegal appropriation of public funds to a private entity, contrary to *N.J. Const.* of 1947, art. VIII, § 3, para. 3, and an illegal exercise of the state police power.

In an unreported decision, the Chancery Division found the statute to be constitutional and entered a money judgment against ACRA. Also in an unreported decision, the Appellate Division, with one judge dissenting, affirmed the finding that the statute was constitutional. The court was unanimous, however, in reversing the money judgment. The different results with respect to the money judgment arose because the trial court found that ACRA was estopped from paying less than the amount authorized by the statute, but the Appellate Division concluded that NJHBPA had not proved the facts necessary to support estoppel.

ACRA filed an appeal of right on the constitutionality of the statute. *R.* 2:2–1(a)(2). Subsequently, we granted NJHBPA's petition for certification on the issue of estoppel. 95 *N.J.* 222 (1983). We hold that because payments authorized by *N.J.S.A.* 5:5–66 serve the public purpose of aiding New Jersey horsemen and do not involve public funds, the statute is constitutional. We hold further that ACRA is not estopped from paying less than the statutory maximum to NJHBPA.

I

NJHBPA is one of twenty-six regional divisions of the Horsemen's Benevolent and Protective Association (HBPA). HBPA is a national nonprofit organization that serves both as a charity aiding the horserace industry and as a representative of racetrack personnel, primarily owners and trainers. According to its constitution, the purposes of HBPA are to provide relief to owners and trainers who are old, sick, and poor, to negotiate purse contracts, and to improve living conditions for its members. Each of the regional divisions, including NJHBPA, is bound by HBPA's national constitution and bylaws and may not unilaterally change its procedures or benefits to meet local needs.

ACRA is a New Jersey corporation licensed pursuant to *N.J.S.A.* 5:5–39.1 to conduct horseraces, *i.e.,* it is a race track. It accepts bets from customers, the sum of which is commonly known as the "handle," and is sometimes referred to in relevant statutes as "contributions" or "deposits." As with other racetracks, ACRA's activities are controlled by statutes and regulations adopted by the New Jersey Racing Commission.

Before 1971, the statute governing racing did not expressly establish the portion of the total amount bet that should be distributed as "purse money" to the owners of winning racehorses. Beginning in 1971, the Legislature has allocated varying percentages of the handle to horse owners. *L.* 1971, *c.* 159, § 1. Although the original provision required the tracks to

distribute the entire allocation "as purse money," *id.*, a 1974 amendment directed that it be distributed "as purse money and for programs designed to aid the horsemen and their representatives." *L.* 1974, *c.* 181, § 3. As of 1974, the racetracks were required to pay out 3.74% of the handle "as purse money and for programs designed to aid the horsemen and their representatives." *Id.* Of the sum available for purse distributions, the Legislature fixed a maximum of 3.2% (of the 3.74%) that could be allocated for such programs. *Id.* In 1975, the Legislature, for the first time, designated NJHBPA as a recipient of funds, requiring that 4.24% of the total amounts wagered be allocated "as purse money and for programs designed to aid the horsemen and the New Jersey Horsemen's Benevolent and Protective Association." *L.* 1975, *c.* 327, § 2. The 1975 amendment also provided for a 7.24% purse share for pools where the betting customer selects three or more horses, known as "trifectas." In addition, the amendment lowered the ceiling for horsemen's aid programs to 2.9% of the available purse money. The ceiling was reduced further to 2.5% in 1979, *L.* 1979, *c.* 94, § 2, and remains at that level, *N.J.S.A.* 5:5–66b.(1)(d) and b.(2)(d), except at the Meadowlands track where a 2.9% ceiling applies. *L.* 1980, *c.* 25, § 4, codified at *N.J.S.A.* 5:10–7.

Determining the appropriate allocations under the statute requires an estimate by each track of the total parimutuel wagering for a given time period. Of that total, the statutory percentage, currently 6% where the average daily handle is less than $1 million, is designated as purse money. Then 2.5% (the current ceiling) of that amount is set aside for NJHBPA, and the remainder apportioned for distribution in the various races to be run during the applicable time period. Thus, for example, some $56,000 in total purse money was available for distribution in nine races at the Atlantic City Race Course on July 16, 1980. Of that amount, only $54,601 was actually paid to owners as "net" purse money; the remaining $1,399, approximately 2.5% of $56,000, was deducted for the use of NJHBPA.

Pursuant to the statutory authorization, ACRA and other New Jersey racetracks have made payments to NJHBPA since 1975. Although the allocation varies with wagering volume, NJHBPA received a total of approximately $600,000 in 1978 and 1979. In the racing year 1978, ACRA paid to NJHBPA $75,498.00, which represents 2.9% of the statutorily required 4.24% of the total handle paid out in purse money. Although ACRA fulfilled the statutory mandate by allocating 7.24% of the amount bet to trifecta purses, it paid NJHBPA only 2.9% of 4.24% of the trifecta purse. In other words, ACRA reserved 3% of the trifecta handle exclusively for payment to the owners as purse money.

In 1979, ACRA declined to pay NJHBPA the full 2.5% allowable purse share under the amended statute. *L.* 1979, *c.* 94, § 2. Instead, ACRA paid NJHBPA the full 2.5% allowable for only part of the year, beginning in August of 1979. ACRA further changed its method of payment, deducting the maximum statutory percentage directly from the winning purses instead of from the handle.

Of the approximately $600,000 that NJHBPA was allotted pursuant to this statutory scheme, only about half of its 1979 budget was expended for purely benevolent programs. Approximately $220,000 was expended for overhead costs, including $23,260 for entertainment and $20,202 for travel. NJHBPA paid nearly $90,000 to HBPA for NJHBPA's share of national costs.

The essence of NJHBPA's claim for money is that ACRA underpaid it for sums due from the 1978 and 1979 racing seasons in an amount totaling $100,975.46. The claimed damages are for amounts not paid in 1978 on the extra 3% of the trifecta purses and the amount representing the statutory maximum of 2.5% of total purse monies for 1979.

## II

Common to determining whether *N.J.S.A.* 5:5–66 contravenes the constitutional prohibitions against special legislation and

illegal appropriations of public funds is the question whether the statute furthers a public purpose. Three years ago, we concluded that in aiding New Jersey's owners, trainers, and other racetrack personnel, the statute fostered New Jersey's horseracing industry. *Jordan v. Horsemen's Benevolent & Protective Ass'n*, 90 *N.J.* 422, 433–35 (1982). In upholding the statute against a challenge that it amounted to unconstitutional special legislation, we applied a three-pronged analysis to determine: (1) the purpose and subject matter of the statute; (2) whether any persons who were excluded should have been included; and (3) the reasonableness of the legislative classification, given the purpose of the statute. *Id.* at 432–33, citing *Vreeland v. Byrne*, 72 *N.J.* 292, 298–301 (1977); *see also Township of Mahwah v. Bergen County Bd. of Educ.*, 98 *N.J.* 268 (1985) (*N.J.S.A.* 54:4–5, which before repeal permitted certain taxing districts to receive rebate from county, satisfies the three-part *Vreeland* test); *Newark Superior Officers Ass'n v. City of Newark*, 98 *N.J.* 212 (1985) (*N.J.S.A.* 40:69A–60.7, which allows mayors of certain cities to appoint police chiefs, satisfies *Vreeland* test).

We apply the same test in the present case. A statute has a public purpose if it benefits the community as a whole and relates to the functions of government. *Roe v. Kervick*, 42 *N.J.* 191, 207 (1964). Furthermore, the regulation of horseracing, including promotion of the interests of horsemen, is within the authority of the Legislature to protect the health, safety, and general welfare of the people. *Id.* at 212. NJHBPA, which provides for the welfare of horsemen through fringe benefits such as pensions and insurance, contributes to the maintenance and well-being of the horseracing industry. In providing jobs for many, recreation for even more, and millions of dollars for the State treasury, horseracing, in turn, contributes to the general welfare of the State. We conclude, as we did in *Jordan v. Horsemen's Benevolent & Protective Ass'n, supra*, 90 *N.J.* at 433–34, that in aiding New Jersey horsemen, *N.J.S.A.* 5:5–66 serves a public purpose.

In *Jordan,* nonetheless, we perceived a constitutional defect in the statute, namely, the exclusion from the association's benevolent programs of New Jersey horsemen who are not in good standing with HBPA. We eliminated the defects by construing the statute as extending those benefits to all such horsemen. So construed, we found the statute to be facially constitutional in light of its underlying purpose of aiding all horsemen. *Jordan v. Horsemen's Benevolent & Protective Ass'n, supra,* 90 *N.J.* at 435–36.

Notwithstanding that finding, we left open the possibility that the statute as applied might be used solely for NJHBPA's private purposes. *Id.* at 436. To prevent that untoward result, we voiced our expectation that the State Treasurer and the New Jersey Racing Commission would perform their statutory obligations to scrutinize the expenditures of NJHBPA. We found the evidence in *Jordan* to be insufficient to sustain a constitutional challenge to the statute as applied. *Id.* In this proceeding, ACRA has not adduced any new facts to change that finding.

We venture to suggest, however, that it is appropriate, if not critical, for the New Jersey Racing Commission to adopt regulations governing NJHBPA expenditures. At present, the only guidance derives from the broad statutory language that funds paid to NJHBPA are "for programs designed to aid the horsemen * * *." *N.J.S.A.* 5:5–66b.(1)(d) and b.(2)(d). In the absence of implementing regulations, therefore, the statute remains susceptible to arbitrary application. Regulatory guidelines would serve an important function for interested parties. For example, they would advise NJHBPA of "the rules of the game," so that it could act with reasonable assurance. *Boller Beverages, Inc. v. Davis,* 38 *N.J.* 138, 151–52 (1962) (in the absence of regulations, Director of Alcoholic Beverage Commission may not rule illegal the sale of corn liquor in mason jars). The regulations would also facilitate judicial review of any administrative decision and ensure that the agency is fulfilling

the legislative mandate. *Crema v. N.J. Dep't of Environmental Protection,* 94 *N.J.* 286, 299–302 (1983).

To summarize, we conclude that the statute's dominant goal furthers a valid public purpose, despite the incidental benefit that accrues to NJHBPA's private interests. This conclusion also serves to establish that the statute, as construed, is a reasonable exercise of the Legislature's police power.

### III

This appeal also raises the issue whether *N.J.S.A.* 5:5–66 effects an illegal appropriation of funds contrary to *N.J. Const.* of 1947, art. VIII, § 3, para. 3. That provision prohibits a "donation of land or appropriation of money * * * by the State or any county or municipal corporation to or for the use of any society, association or corporation whatever." This proscription is designed to insure that public money is used for public purposes. *Roe v. Kervick, supra,* 42 *N.J.* at 207.

At the threshold, a challenge to the constitutionality of the statute requires a determination whether public money is being expended. That determination generally involves one of two kinds of expenditure. One is an outright disbursement of state or municipal funds to or for a private organization or person. *Mt. Laurel Township v. Public Advocate of N.J.,* 83 *N.J.* 522 (1980) (public funds appropriated to Public Advocate used for enforcement of court order directing township to modify exclusionary zoning ordinance); *Roe v. Kervick, supra,* 42 *N.J.* at 198–200 (provision in Area Redevelopment Assistance Act allowing New Jersey Area Redevelopment Authority to make loans out of specially created state fund); *Hoglund v. Summit,* 28 *N.J.* 540 (1959) (money appropriated by municipality for opening and improvement of public street, specially benefitting non-profit civic foundation that owned and was to operate a housing project on adjacent property); *New Jersey Sports & Exposition Auth. v. McCrane,* 119 *N.J.Super.* 457 (1971), *aff'd,* 61 *N.J.* 1, *appeal dismissed,* 409 *U.S.* 943, 93 *S.Ct.* 270, 34

*L.Ed.*2d 215 (1972) (appropriation of public money to enable New Jersey Sports & Exposition Authority to carry out duties relating to construction and operation of sport facility).

The second form of public expenditure involves indirect gifts that occur when the state or a municipality confers a private benefit by foregoing its vested legal right to receive money or property from a private entity. *Raritan Engine Co. v. Edison Township*, 184 *N.J.Super.* 159 (1982) (passage of title to real property from municipal fire district to successor volunteer fire company unconstitutional); *Wilentz v. Hendrickson*, 133 *N.J. Eq.* 447 (Ch. 1943), *aff'd*, 135 *N.J. Eq.* 244 (E. & A. 1944) (law cancelling interest due on back taxes owed by railroads unconstitutional); *In re Voorhees Estate*, 123 *N.J.Eq.* 142, (N.J.Prerog.Ct.1938), *aff'd sub nom. Union County Trust Co. v. Martin*, 121 *N.J.L.* 594 (N.J.Sup.Ct.1939), *aff'd*, 124 *N.J.L.* 35 (E. & A. 1940) (retroactive application of statute exempting certain inheritance taxes owed to state unconstitutional).

We find that the statute does not make any appropriation, direct or indirect, of public funds. Payments to NJHBPA are not paid from the State treasury but are simply diverted from bets made by racetrack customers. In short, the money comes from private bets, not the public fisc.

Furthermore, the challenged statute does not mandate that ACRA pay a specified amount to NJHBPA; rather, the statute merely authorizes ACRA and other racetracks to make payments to NJHBPA up to a prescribed limit. Because the payments do not involve public funds, ACRA has failed to establish a violation of the constitutional proscription against appropriations of such funds for private purposes.

## IV

We turn now to NJHBPA's appeal from the Appellate Division's reversal of the trial court's finding that ACRA should be equitably estopped from paying less than the statutory maximum for 1979. NJHBPA concedes that *N.J.S.A.* 5:5–66 does

not prevent ACRA from negotiating for payment of a sum less than the statutory maximum. Because ACRA always paid that maximum before 1979, however, NJHBPA contends that the racetrack should be equitably estopped from paying a lesser amount. We disagree.

In reaching that decision, we rely on Justice Handler's description of equitable estoppel:

> Conduct amounting to a misrepresentation or concealment of material facts, known to the party allegedly estopped and unknown to the party claiming estoppel, done with the intention or expectation that it will be acted upon by the other party and on which the other party does in fact rely in such a manner as to change his position for the worse gives rise to an equitable estoppel. [*Carlsen v. Masters, Mates & Pilots Pension Plan Trust*, 80 *N.J.* 334, 339 (1979).]

As that description recognizes, essential to a finding of estoppel is a misrepresentation of material fact by one party and an unawareness of the true facts by the party seeking an estoppel. *Clark v. Judge*, 84 *N.J.Super.* 35, 54 (Ch.Div.1964), *aff'd o.b.*, 44 *N.J.* 550 (1965). Here, however, ACRA never represented that it would continue to pay the statutory maximum, and both NJHBPA and ACRA knew that the statute did not require payment of the maximum amount. *See Widmer v. Township of Mahwah*, 151 *N.J.Super.* 79 (App.Div.1977) (police officer estopped from claiming seniority rights on voluntary transfer to another municipality when he expressly waived rights of which he knew or was conclusively presumed to know). Hence, we conclude, as did the Appellate Division, that ACRA is not estopped from paying less than the full amount authorized by the statute. This holding, however, does not absolve ACRA from its future obligation to agree with NJHBPA concerning "[t]he formula for distribution of the purse money as either overnight purses or special stakes." *N.J.S.A.* 5:5–66b.(1)(b).

Our holding that NJHBPA is not entitled by principles of estoppel to receive the maximum allowed by statute also applies to its claim to a larger share of the trifecta purse for 1978. NJHBPA had no greater right to share in the extra 3% compris-

ing the trifecta purse than it did in any other purse. An amendment effective January 1, 1979 now puts the matter to rest by entitling NJHBPA to receive "purse money from all parimutuel pools." *N.J.S.A.* 5:5–66b.(1)(d) and b.(2)(d); *L.* 1979, *c.* 94, § 2a.(1)(d) and (2)(d). Before the effective date of the statute, however, NJHBPA depended on ACRA's willingness to include the larger amount allocated for trifecta purses as the basis for computing payments.

■ Finally, the Appellate Division judgment affirmed the trial court's order directing ACRA to repay winning horse owners sums deducted in 1979 from their individual purses for payment to NJHBPA. Although the owners apparently did not object, NJHBPA contends that the practice violates *N.J.A.C.* 13:70–3.29. The regulation, which was adopted by the New Jersey Racing Commission before the enactment of *L.* 1979, *c.* 94, § 2a.(1)(d) and (2)(d), provides: "No percentage of winnings shall be deducted by an association for itself or for another person, club or body, unless at the request of the person to whom such winnings are payable and except that an association may withhold from winnings any money due it."

The statute, however, combines the purses for owners and payments to NJHBPA in calculating distributions to be made by the racetracks. In 1979, *N.J.S.A.* 5:5–66b.(1)(d) directed a track, when the average daily handle is less than $1 million, to distribute for purse money and for NJHBPA 7.16% (since reduced to 6.0%) of the "contributions." *L.* 1979, *c.* 94, § 2a.(1)(d). Although NJHBPA objected to the direct deduction from the individual owners' purses, it has not established how making the deduction in that manner, as distinguished from the prior practice of making the deduction from the sums available for distribution, works to the disadvantage of the horse owner. Under both methods, the deduction for NJHBPA is made from the owners' winnings, and the net effect on the horse owner is the same.

The regulation, which appears to be designed to preclude deductions for creditors of the horsemen, does not apply to a racetrack such as ACRA when deducting statutorily-authorized payments from purse winnings for NJHBPA. As with other aspects of the relationship between NJHBPA and the racetracks, the deduction of payments from individual purses might be an appropriate subject of further regulations. For our purposes, it suffices to conclude that under the present statutory and regulatory system ACRA is not obliged to repay horse owners for the 1979 deductions from their purses.

The judgment of the Appellate Division is modified and affirmed.

*For affirmance as modified*—Justices CLIFFORD, SCHREIBER, HANDLER, POLLOCK, O'HERN and GARIBALDI—6.

*For reversal*—None.