251 N.J. Super. 589 (1991)
598 A.2d 1243
NEW JERSEY DIVISION, HORSEMEN'S BENEVOLENT PROTECTIVE ASSOCIATION AND MARTIN FALLON, PETITIONERS-RESPONDENTS,
v.
NEW JERSEY RACING COMMISSION, RESPONDENT.
NEW JERSEY THOROUGHBRED HORSEMAN'S BENEVOLENT ASSOCIATION, INC., A NEW JERSEY NON-PROFIT CORPORATION; JAMES P. MURPHY; PATRICK L. BOTTAZZI; SUE DOLLINGER; JOHN FIERAMOSCA; EDWARD H. BARNEY; JOHN DESTEPHANO, ROBERT J. DURSO; MEL W. GROSS; AND LOUIS F. JOLIN, PLAINTIFFS-APPELLANTS,
v.
NEW JERSEY DIVISION, HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION, INC.; HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION, INC., A KENTUCKY CORPORATION; DEFENDANTS-RESPONDENTS, AND NEW JERSEY RACING COMMISSION, DEFENDANT.
Superior Court of New Jersey, Appellate Division.
Argued October 22, 1991.
Decided November 19, 1991.
*591 Before Judges PRESSLER, SHEBELL and D'ANNUNZIO.
Joseph Maddaloni, Jr. argued the cause for New Jersey Division, Horsemen's Benevolent & Protective Association, Inc., and Horsemen's Benevolent & Protective Association, Inc. (Crummy, Del Deo, Dolan, Griffinger & Vecchione, attorneys; David J. Sheehan and Joseph Maddaloni, Jr. on the brief and reply brief).
Kenneth L. Winters argued the cause for New Jersey Thoroughbred Horseman's Benevolent Association, Inc. (Carella, Byrne, Bain, Gilfillan, Cecchi & Stewart, attorneys; Kenneth L. Winters on the brief and reply brief).
Sherrie L. Gibble, Deputy Attorney General, argued the cause for New Jersey Racing Commission (Robert J. Del Tufo, Attorney General, attorney; Joseph L. Yannotti, Assistant Attorney General, of counsel; Sherrie L. Gibble on the brief).
The opinion of the court was delivered by PRESSLER, P.J.A.D.
These consolidated appeals, which arise out of internecine conflict among the horsemen of this state respecting the control and management of funds statutorily allocated for horsemen's benevolence programs (Fund), raise important questions concerning the scope of the adjudicatory power of the New Jersey Racing Commission over the use of the Fund.
*592 Although various other collateral issues are here implicated, the primary dispute before us derives from the claim of plaintiff, New Jersey Thoroughbred Horseman's Benevolent Association, Inc. (Corporation), that defendant, New Jersey Division, Horsemen's Benevolent & Protective Association, Inc. (Division), one of 26 unincorporated regional chapters of defendant, Horsemen's Benevolent & Protective Association, Inc. (National), mismanaged and misspent $100,000 of Fund money. A consent judgment entered into between the Racing Commission and the Division in a prior administrative proceeding purported to settle the claim for, among other terms, the Division's undertaking to reimburse $5,000 to the Fund. The first question is whether that consent judgment binds the Corporation and the plaintiff owners and trainers, beneficiaries of the Fund who seek its vindication, even though none of them was a party to it. The second question is whether the Racing Commission has exclusive jurisdiction to adjudicate what is essentially a common-law action based on asserted misappropriation and mismanagement of a trust res by its trustees and whether it has the capacity to afford a complete remedy to the beneficiaries for breach of trust. In the circumstances here, we answer both these questions in the negative.
Focusing of the issues requires a foray into the historical and legal background of the Fund as well as the events leading to this litigation. The controversy has its genesis in a series of legislative enactments, reviewed by the Supreme Court in Jordan v. Horsemen's Benev. & Protect. Ass'n, 90 N.J. 422, 448 A.2d 462 (1982), which, since 1975, has required a portion of the owners' purse money[1] to be distributed by the operators of running race meetings "for programs designed to aid the horsemen and the New Jersey Horsemen's Benevolent and *593 Protective Association."[2]See N.J.S.A. 5:5-66(b)(2), so providing as to all operators except the New Jersey Sports and Exposition Authority (Authority), and N.J.S.A. 5:10-7(f)(2), so providing as to the Authority. The present maximum percentages of the purse money so allocated, 2.9% for Authority meetings and 2.5% for all other meetings, currently generate an annual Fund contribution in excess of one million dollars.
The Supreme Court recognized in Jordan that while the terms of the statutory allocation are construable as authorizing payment not only to the Division but also for "other programs," it noted nevertheless that no other programs in fact "receive money under the statutory provisions, and no statute or regulation indicates how such programs might qualify for funding if established." 90 N.J. at 429, 448 A.2d 462. At the time Jordan was decided, the annual sum received by the Division was about $600,000, and about half its budget was used for benevolent purposes for owners, trainers and their employees, including a professionally administered pension plan, an uninsured medical cost reimbursement program, a race-track chaplaincy, and a variety of ad hoc assistance programs for members. Over a third of the Division's budget was used for overhead expenses, including entertainment and travel, and close to a fifth was sent by it to the National "to pay the region's share of national costs." Id. at 430, 448 A.2d 462. Also at the time Jordan was decided, there was no control by either statute or regulation over the disposition and management of the Fund by the Division. The only oversight was the requirement of N.J.S.A. 5:5-92 that the Division file with the State Treasurer and the Racing Commission an annual audit prepared by a certified *594 public accountant which would be "subject to the review" of both agencies.
In Jordan, the Supreme Court sustained the validity of the statutory scheme against the claim of violation of the state constitutional interdictions against proscribed special legislation and against appropriation of money for private associations. N.J. Const. art. IV, § 7, ¶¶ 7 and 9; art. VII, § 3, ¶ 3. It did so by engrafting thereon the requirement that participation in the Fund's programs not be conditioned on membership in either the National or the Division and the further requirement that the statutory review of the Division's audit referred to by N.J.S.A. 5:5-92:
be sufficient to insure that the statutory allocation is used to finance benevolent programs and the administrative and overhead costs reasonably related to these programs. The statute may not be used to obtain funds to finance [Division] or [National] except insofar as those organizations fulfill the statutory purpose of caring for New Jersey horsemen on a non-discriminatory basis. [Id. at 436, 448 A.2d 462]
The Court further assumed that the State Treasurer and the Racing Commission would "perform the statutory obligation" to "scrutinize the expenditures" of the Division and noted that "judicial intervention would be justified" if it appeared that the statutory allocation was being used to advance "private interests under the guise of general welfare." Id.
Three years later, in Horsemen's Benev. & Protect. Ass'n v. Atlantic City Racing, 98 N.J. 445, 487 A.2d 707 (1985), the Supreme Court, again sustaining the state constitutional validity of the statutory allocation scheme, once more noted "the possibility that the statute as applied might be used solely for [Division's] private purposes," reiterated its caution that the Treasurer and the Racing Commission should scrutinize the Division's expenditures, and "venture[d] to suggest" that the Racing Commission adopt regulations to govern those expenditures. Id. at 453, 487 A.2d 707.
During the next several years, tensions developed between the Division and the National. As explained by the Division's then attorney in a later informal hearing conducted by the *595 Racing Commission's Executive Director to which reference is hereafter made:
a great number of people ... felt that the National HPBA was not advancing the best interest of New Jersey thoroughbred horsemen at least as a whole.... [I]t came to be known that the National HBPA was extracting from the New Jersey Division enforced contributions in the nature of both regular and special assessments which had gotten up towards $100,000 per year.... New Jersey being the third largest contributor to the National HBPA's regular and special financial needs, many New Jersey horsemen came to be critical of these expenditures and asked, in effect, what in the world was New Jersey getting as a result of making these substantial contributions.
It further appears that in 1987, in response to pressure from various divisions, the National amended its by-laws to permit its divisions to incorporate on their own. We gather from the record that at least one reason National took this step was to enable each division to insulate its locally generated resources from liability for debts of the National and other divisions. We also gather that the National's intention was to substitute for the unincorporated division structure some kind of corporate affiliation between it and those of its former divisions opting for the incorporation route.
In any event, the New Jersey horsemen's leadership, including Division officers, opted to incorporate and filed a certificate of incorporation in February 1988 creating plaintiff Corporation. It further appears that there was then substantial harmony within the leadership, and the plan accordingly made, with the approval of the Racing Commission and the Attorney General, was that the Corporation would begin its financial life on October 1, 1988 and from that date forward would be the recipient of the statutorily allocated funds and the administrator of the benevolence programs. To some extent, the National was a party to this plan, having, in implementation thereof, settled its outstanding claims for contributions from the Division, also with Racing Commission approval.
Although there was no impediment to the efficacy of the October 1, 1988 date as a matter of prospective operation, the complete turnover of function and control from the Division to the Corporation could not, however, be by then accomplished *596 because of federal tax complications. That is, it became known during the planning stage that the National had either failed to obtain or had lost its federal tax exempt status. Consequently, until that status could be established or reestablished, there was a risk that the transfer to the Corporation by the Division of its remaining cash assets of about $300,000 might constitute a taxable event. In order to avoid that possibility, it was agreed that the Division would retain those assets as a shell entity, transferring them to the Corporation when it would be safe to do so.
In the meantime, the Racing Commission, in February 1988, and pursuant to the Supreme Court's suggestion, finally adopted a regulation, N.J.A.C. 13:70-1.30, establishing guidelines for the management of the Fund. In sum, the regulation requires segregation by the recipient of Fund money from those of its assets having other sources, imposes bookkeeping requirements, requires the submission of detailed budgets as well as audits, and prescribes general expenditure guidelines, establishing as presumptively reasonable a 70/30 ratio between benevolence program costs and costs for administrative and overhead expenses. Significantly, the regulation permits payments to national organizations "only to the extent that the [local] horsemen's organizations can clearly show that the payments benefit all New Jersey horsemen, not just members of those organizations." Finally, the regulation includes a penalty section permitting the imposition of a monetary sanction not in excess of $1000 for each violation of its terms.
The accord which culminated in the establishment of the Corporation and its assumption of control over the Fund was short-lived. Not long after the October 1, 1988 commencement date, conflicts developed between the leadership faction which wanted to affiliate with the National and the faction which apparently preferred not to do so. Several corporate officers belonging to the pro-affiliation faction resigned and attempted to resurrect the Division as a functioning entity. They started to spend money from its still untransferred assets despite the *597 Division's failure to have filed the prerequisite budget with the Racing Commission, and they claimed the exclusive right to receive and manage the Fund. The Racing Commission attempted to mediate between the two groups, but the Division refused to cooperate. In January, 1989, having retained its own counsel, a member of the Pennsylvania bar whose fees are among the disputed financial issues, the Division suggested to the Racing Commission that it had no authority to have adopted the regulation or to exercise any supervisory authority over the Fund. The Racing Commission responded by ordering the Division to spend no Fund money until it had submitted a budget in accordance with the regulation. The Racing Commission also instructed the meeting operators to place the Fund money in escrow pending resolution of the controversy.
In February 1989 the Racing Commission filed an action in the Chancery Division naming both the Corporation and the Division as defendants and seeking an adjudication of which of the two was entitled to administer the benevolence programs and to control the Fund assets accumulated prior to October 1, 1988. The Chancery Division, by order entered March 16, 1989, transferred the entire matter back to the Racing Commission pursuant to R. 1:13-4(a), concluding that "the issues are more properly to be considered by the plaintiff as a State administrative agency."
Responding to the transfer order, Executive Director Bruce Garland wrote the next day to, among others, the Corporation, the Division and the National, advising that he would hold a hearing on April 10, 1989, to determine whether either the statute or the regulation had been violated and to determine "which group shall administer the pension, health and benevolence programs, administer the statutorily allocated funds maintained in various bank accounts, and obtain the funds being generated at the Garden State Park meeting and future meetings." By way of interim Fund management, Executive Director Garland then ordered that the Corporation continue to administer the benevolence programs in accord with the approved *598 1988 budget and that the Division not spend any Fund money, except in accordance with the regulation. The hearing commenced as scheduled. On the first hearing day separate appearances were made by the Corporation, the Division and the National, and the primary issue tried related to the competing claims of the Corporation and the Division. At the close of that day's hearing, Executive Director Garland again ordered the Division to expend no Fund money, pendente lite, stating as follows:
And I am also warning the officers and board of directors of the New Jersey HBPA Division that they will have administrative actions brought against their licenses to participate in racing in New Jersey, if they violate or attempt to violate that order. That order is until the completion of the hearing. And it's my understanding that it's consistent with the Appellate Division decision handed down on Friday until a decision is reached.
If, in the interim, there are situations that you would like to apply for use of money from these accounts, you may apply directly to me for approval to spend those sums.
Just so we are clear, this hearing is not over, it's not completed. My orders remain in effect and they directly pertain to the accounts that I have listed in my prior order for which you have responded today.
I have also had contact with the National organization and they have indicated to me that they will not attempt to cash any checks that have been submitted to them pending the conclusion of this hearing.
Prior to the resumption of the hearing the Racing Commission, in late May, appointed a committee, the Dowd Committee, consisting of Commissioner Dowd, a Racing Commission staff member, a representative of the Corporation and a representative of the Division, to investigate further the Division-Corporation conflict over which was the horsemen's rightful representative in respect of the Fund.[3] Presumably because of the *599 severance of that issue from the continuing proceedings before the Executive Director, the Corporation made no further appearance at the hearings, which concluded in June after three additional hearing sessions. These sessions dealt primarily with the Division's expenditure of about $100,000 in apparent defiance of the Executive Director's prior orders, of which only some $16,000 was spent for benevolence programs, and the Division's foiled attempt to send the National an additional sum of approximately $50,000.[4]
Following the hearing, Executive Director Garland, in a scathing condemnation of the Division's conduct, issued a detailed decision, recommendation and order. He concluded that the Division, and particularly its president, vice-president, and secretary-treasurer, had wilfully violated both the regulation and his interim orders not only by having made the prohibited expenditures but also by withholding information from and misleading Racing Commission auditors. While the decision questions the propriety of much of the total expenditure in terms of the Fund's stated statutory and regulatory purposes, it nevertheless makes no specific findings of substantive impropriety, resting instead upon the gross procedural irregularities and improprieties attending the expenditures. Concluding, based thereon, that the "actions by the Division and its officers were detrimental to the best interest of racing and harmful to the horsemen," the Executive Director sanctioned the three individuals; ordered the Division to spend no statutorily allocated funds prior to January 1991, when it might then apply for the right to do; to "replace" either itself or assisted by the National all money spent except the payments for benevolence; to pay no outstanding bills without the approval of the Dowd *600 Committee; to transfer all statutorily allocated funds in its name to a Racing Commission escrow account; and to notify all claimants for benevolence that no payments could be made by it out of statutorily allocated funds.
The Division and the National appealed to the Racing Commission from the Executive Director's decision, and the matter was transferred to the Office of Administrative Law (OAL) for disposition as a contested case. It does not appear that the Corporation was noticed of or regarded as a party at this stage of the proceedings and it did not participate in them at all. In June 1990, prior to any OAL hearing, the Racing Commission, the Division, and Division's individually sanctioned officers executed a consent judgment, captioned in the OAL proceedings. Under the terms of the consent judgment, the Division agreed to its suspension from expending statutorily allocated funds until the end of 1990. The Racing Commission agreed that the Division had the right to submit budget proposals for 1991. Finally the Division agreed to "pay restitution, in lieu of a fine, in the amount of $5,000" and that "this consent judgment shall conclude and terminate all litigation arising from and referred to in the initial decision of Executive Director Bruce Garland and the appeal therefrom."
Shortly thereafter the Corporation and the named individual owner and trainer beneficiaries of the Fund filed a verified complaint in the Chancery Division against the Division, the National and the Racing Commission, claiming not to be bound by the consent judgment, seeking a remedy for conversion of the expended statutorily allocated funds and demanding enforcement of the statutorily-created trust. The complaint was dismissed on defendants' motion, the trial judge concluding that the Racing Commission's jurisdiction of any restitutionary remedy was primary, if not exclusive. Plaintiffs thereupon appealed from the consent judgment itself although they were not parties to it. That is the first of the two appeals before us. They then filed a notice of appeal from the dismissal of their *601 Chancery Division action. That is the second of the two appeals.
As we have noted, there are essentially two distinct but nevertheless closely interrelated issues before us: first, whether plaintiffs are bound by the consent judgment to which they were not parties, and second, whether anything in the statutory scheme creating the Fund evinces a legislative intent to confer upon the Racing Commission exclusive jurisdiction to adjudicate all legal and factual disputes involving control and disposition of the Fund.
We begin with first principles. We note at the outset that the business of horse racing has long been regarded as affected with the public interest to a degree that justifies its stringent regulation by the Racing Commission. See, e.g., State v. Garden State Racing Ass'n, 136 N.J.L. 173, 179, 54 A.2d 916 (E & A 1947). This public interest, moreover, underlies the statutory creation and judicial validation of the Fund. Thus, as the Supreme Court held in Horsemen's Benev. & Protect. v. Atlantic City Racing, supra, 98 N.J. at 452, 487 A.2d 707:
... the regulation of horseracing, including promotion of the interests of horsemen, is within the authority of the Legislature to protect the health, safety, and general welfare of the people.... NJHBPA, which provides for the welfare of horsemen through fringe benefits such as pensions and insurance, contributes to the maintenance and well-being of the horseracing industry. In providing jobs for many, recreation for even more, and millions of dollars for the State treasury, horseracing, in turn, contributes to the general welfare of the State. We conclude, as we did in Jordan v. Horsemen's Benevolent & Protective Ass'n, supra, 90 N.J. at 433-34 [448 A.2d 462], that in aiding horsemen, N.J.S.A. 5:5-66 serves a public purpose. [citations omitted]
It is in this context that we consider the uniquely hybrid public and private character of the Fund. It represents, essentially, a legislatively prescribed assessment upon the legislatively created property rights of a specific class  that is, the statutorily defined right of horse owners to purse money. That assessment is then turned over to a private organization for its execution of "the legislative purpose of aiding racing personnel." Jordan, supra, 90 N.J. at 435, 448 A.2d 462. While the Fund defies simple or certain classification, we are satisfied *602 that its attributes are most nearly akin to those of a quasi-public charitable trust for the benefit of a large and indefinite class which, the record suggests, now totals some 6,000 owners, trainers, and employees. The trust res is, of course, the percentage of the purse money so allocated, the settlors are the owners themselves under the statutory scheme, and the trustee is the private non-profit organization receiving and administering the res for the adjudicated public-welfare trust purpose. See generally, Restatement (Second) of Trusts, Chapter 11, Introductory Note, §§ 348, 363, 364, 368(f), 374, 375 (1959). Thus the Fund, to the considerable extent to which it constitutes a quasi-public charitable trust, must be deemed to be, as are all charitable trusts, under the general supervisory power of the Chancery Court, which may be invoked by the Attorney General, a trustee, or by a person having a special interest in it. See Terwilliger v. Graceland Memorial Park Ass'n, 59 N.J. Super. 205, 216-17, 157 A.2d 567 (Ch.Div. 1960), aff'd, 35 N.J. 259, 173 A.2d 33 (1961). See also Restatement, supra, § 391 at 278-279.
The jurisdictional question before us is whether the enabling legislation purports to vest the court's inherent power exclusively in the Racing Commission. We see no indication that it does. The only regulatory provision of the statute itself is, as we have noted, the requirement that the trustee submit annual audits to the Racing Commission and the State Treasurer. The statute is altogether silent as to what remedies are available and to whom and in what forum if either of these agencies or any other specially interested person is dissatisfied with the audit or if the audit is never even filed. That provision, in our view, hardly constitutes a vesting of exclusive supervisory or adjudicatory jurisdiction in either agency. Nor does it bespeak an intention to impinge upon the Superior Court's constitutionally conferred "original general jurisdiction throughout the State in all causes." N.J. Const. art. 6, § 3, ¶ 2. See generally, Swede v. City of Clifton, 22 N.J. 303, 125 A.2d 865 (1956); Caldwell Terrace Apts. v. Borough of Caldwell, *603 224 N.J. Super. 588, 594, 541 A.2d 221 (App.Div. 1988). Indeed, that statutory provision may be viewed primarily as either a transfer of the Attorney General's general authority over charitable trusts to the Racing Commission and the State Treasurer, jointly or severally, or as a sharing of that authority by the Attorney General with these agencies. It patently does not, however, deprive the court of its traditional and inherent power.
We do not, of course, question the authority of the Racing Commission to have promulgated the supervisory regulation, as it was encouraged to do by the Supreme Court. Nor do we question the power, indeed the obligation, of the Racing Commission to enforce its regulation and to sanction those who violate it by fines, license suspensions and other appropriate administrative penalties. But we think it plain that the promulgation of the regulation and the Racing Commission's authority to enforce it do not preempt the court's inherent equitable jurisdiction to enforce a charitable trust. As articulated by the Restatement, supra, § 392 at 281, "The remedies for the failure of the trustees of a charitable trust to perform their duties under the trust are exclusively equitable." Hence, a suit in equity can be maintained by a responsible public official, trustee or specially interested person "to compel the trustees of a charitable trust to perform their duties as trustees, or to enjoin them from committing a breach of trust, or to compel them to redress a breach of trust, or to appoint a receiver to take possession of the trust property, or to remove the trustees and appoint other trustees." Id., Comment (a). The authority conferred by the Legislature on the Racing Commission patently does not abrogate the power of a court of equity to order these remedies in respect of the Fund.
While there is, of course, a degree of concurrency in the jurisdiction of the court and the Racing Commission over the Fund, that concurrency is not congruent. Thus the Racing Commission can require that budgets and audits be filed, that spending follow a ratio guideline and that prescribed bookkeeping and record keeping practices be followed. It can also *604 enforce those requirements by administrative penalties. But not every violation of the regulation will also constitute a breach of trust, not every breach of trust will necessarily constitute a violation of the regulation, and some conduct will do both. Thus, the critical jurisdictional question in our view is the nature of the remedy sought for the alleged improper conduct. See Lally v. Copygraphics, 173 N.J. Super. 162, 179, 413 A.2d 960 (App.Div. 1980), aff'd, 85 N.J. 668, 428 A.2d 1317 (1980). If equitable, then jurisdiction may remain in the court. If regulatory, the primary jurisdiction must be retained by the agency. If both, then coordination must and can be effected by a variety of techniques including judicial determination of the order of proceedings, voluntary abstention and deference, constituting of the agency as a factfinder for the court, in respect of those matters within its special expertise, appropriate application of doctrines of res judicata, estoppel, and election of remedies, and designation of indispensable party status for both public and private entities. See, e.g., Boss v. Rockland Elec. Co., 95 N.J. 33, 468 A.2d 1055 (1983); Lally v. Copygraphics, supra; Wunschel v. City of Jersey City, 96 N.J. 651, 477 A.2d 329 (1984); Feiler v. N.J. Dental Ass'n, 191 N.J. Super. 426, 467 A.2d 276 (Ch.Div. 1983), aff'd, 199 N.J. Super. 363, 489 A.2d 1161 (App.Div.), certif. denied, 99 N.J. 162, 491 A.2d 673 (1984); Hermann v. Fairleigh Dickinson Univ., 183 N.J. Super. 500, 444 A.2d 614 (App.Div.), certif. denied, 91 N.J. 573, 453 A.2d 884 (1982). Cf. as to concurrent agency jurisdiction, City of Hackensack v. Winner, 82 N.J. 1, 410 A.2d 1146 (1980); Hinfey v. Matawan Regional Bd. of Educ., 77 N.J. 514, 391 A.2d 899 (1978). The point of course is that while concurrent court and agency jurisdiction of an entire controversy or of substantial components of a single controversy inevitably poses adjudicative difficulties, these difficulties are subject to resolution which can accommodate the full range of public and private interests at stake consistently with jurisdictional principles and constraints.
*605 Applying these principles, we are first satisfied under the circumstances here that while the Racing Commission clearly had the power to proceed against the Division and its officers for violation of the regulation, a court may be in a better position to afford the full range of equitable and legal remedies for breach of trust which plaintiff sought in the Chancery Division, including an adjudication of breach of fiduciary duty, an accounting, a surcharge in the amount of misappropriated funds plus prejudgment interest, a turnover of the trust res, punitive damages, counsel fees and costs, and implementing injunctive relief.
We are also satisfied that the gravamen of plaintiff's Chancery action goes beyond the Racing Commission's regulatory scheme. See, e.g., Feiler, supra, 191 N.J. Super. at 434, 467 A.2d 276. This is not a case in which, for example, a specially interested party complains of the Racing Commission's action in approving the trustee's budget or of the trustee's action in adhering to its budget. The first would clearly be reviewable by this court pursuant to R. 2:2-3(a)(2), and the second would clearly be within the Racing Commission's initial investigative and quasi-judicial competence. This is, rather, a case in which the trustee proceeded to use the trust res in wilful and wholesale defiance of the regulation itself. There was no budget, no prior approval thereof, no submission to oversight, and no acknowledgement of the Commission's regulatory power. The Division's alleged conduct in this regard, if proved, might well require remedy beyond the administrative capacity, including, if appropriate, permanent removal as trustee, continued qualification only under special terms and conditions, surcharge, pre-judgment interest, and perhaps punitive damages.
We are, moreover, satisfied that the factual issues raised in the Chancery complaint are not only not within the Commission's special expertise but that they are, to the contrary, matters peculiarly within the judicial competence. Fiduciary accountings are the everyday business of the courts. So are determinations of whether the fiduciary's expenditures are *606 proper in terms of serving the trust purpose, are reasonable in amount, and are free from trustee self-dealing and other impropriety arising from trustee conflict. Moreover, as we have noted, a major item of the Division's unregulated expenditure, indeed some $54,000 of the approximately $85,000 it spent for other than direct benevolence program costs, was spent for attorney's fees paid to its Pennsylvania lawyer. The court, rather than the agency, is the obviously appropriate judicial forum for determining whether at all and if so, to what extent, the legal services performed were in aid of the trust purpose and whether the amount of the compensation was reasonable.
We note too that the Racing Commission itself may have recognized the limitation on its ability to afford full equitable relief. First, as we have noted, the Racing Commission's actions were based on Executive Director Garland's findings that the Division's spending was in violation of the procedural prerequisites of the regulation. He may well have questioned the substantive propriety of the spending vis-a-vis the Fund's purpose, but he neither made findings with respect thereto nor based his penalty recommendations thereon. Moreover, the consent judgment itself did not purport to fashion or direct an equitable remedy. Rather, it describes the Division's payment of $5,000 "as restitution, in lieu of a fine." (Emphasis added) By its use of this form of language, the Racing Commission itself may have been acknowledging the limitation of its remedial powers. Moreover, while we recognize that the consent judgment stated the agreement of the Division and the Racing Commission that "all litigation arising from and referred to in the Initial Decision of [the] Executive Director" would thereby "be concluded and terminated," that language is susceptible to being construed as a reference to such litigation as lies within the agency's primary jurisdiction.
Irrespective, however, of the intent of the parties to the consent judgment, we are satisfied that the Racing Commission did not have the power, under the circumstances here, to *607 bargain away, finally and conclusively, the interest of the beneficiary class in the proper administration of the trust res or to abrogate its right to seek appropriate equitable remedies for breach of trust. And it certainly could not, as a matter of procedural due process, have done so without affording notice and a right to be heard to the beneficiary class, whose representative, the Corporation, had been an original party to these administrative proceedings. We are therefore satisfied that plaintiffs have the retained right, despite the consent judgment, to pursue an equitable remedy.[5]
Based on the foregoing, we reverse the order of dismissal by the Chancery Division and remand for further proceedings. We direct that the State Treasurer be noticed thereof because of the responsibility reposed by the statute in that officer, and we direct that the Attorney General be noticed thereof because of his inherent responsibility over all charitable trusts. We further direct that court approval be required in the event of any proposed compromise or settlement of the action. Compare R. 4:32-4. Finally, since the Division is apparently no longer the trustee and has not had access to the trust res for some time, the scope of the action should be limited to the period following October 1, 1988, during which it did have access and made expenditures. The court shall determine whether and to what extent the Division's expenditures during that period were reasonably related to the advancement of the Fund's statutory purpose, and shall order such remedial action as shall be appropriate.
The order of dismissal entered by the Chancery Division, appealed from under Docket No. A-383-90T2, is reversed and we remand for further proceedings consistent herewith. The consent judgment entered by the Racing Commission, appealed *608 from under Docket No. A-6424-89T2, is construed as not foreclosing plaintiffs from the right to pursue an equitable remedy for breach of trust, and it is hereby accordingly modified.
NOTES
[1] The purse money payable to the owners by the meeting operators is a designated percentage of the total parimutuel wagering at each running race meeting.
[2] Since there is apparently no separate incorporated or independent entity known as New Jersey Horsemen's Benevolent and Protective Association but rather only the New Jersey Division of the national corporation, it is clear that it is the Division to which the statute refers. Note further that there are parallel provisions in respect of harness racing in which the trustee of the statutorily allocated fund is the Standardbred Breeders' and Owners' Association of New Jersey. N.J.S.A. 5:5-66(a)(4), 5:10-7(f)(2)(b).
[3] Pursuant to our inquiry, we have been advised that the Dowd Committee had recommended a representative election by New Jersey's horsemen but that no such election has taken place or is scheduled to take place. Rather the dispute has now taken the form of contested elections for officers and directors of the Corporation. We are further advised that those elections have generally resulted in the continuation of corporate control by the anti-affiliation faction. We are also advised that since the Division has not yet been authorized by the Racing Commission to act as trustee, as it were, of the Fund or any part of it, the Corporation has continued as the sole horsemen's representative in this respect.
[4] It appears from the record that when the Executive Director realized the full scope of the Division's financial maneuvering, he "froze" the Division's bank accounts and its check to the National was therefore returned unpaid.
[5] We note that the Corporation, as representing a substantial portion of the beneficiary class, clearly has standing to litigate in its representative capacity. See, e.g., Crescent Pk. Tenants Ass'n v. Realty Equities Corp. of N.Y., 58 N.J. 98, 275 A.2d 433 (1971).