791 A.2d 320

NEW JERSEY THOROUGHBRED HORSEMAN'S ASSOCIATION, PLAINTIFF, v. STATE OF NEW JERSEY; AND NEW JERSEY RACING COMMISSION, DEFENDANTS.

Superior Court of New Jersey
Chancery Division
Monmouth County

Decided October 19, 2001.

126

*Dennis A. Drazin,* for plaintiff (*Drazin and Warshaw,* attorneys).

*Judith A. Nason,* Deputy Attorney General (*John J. Farmer, Jr.,* Attorney General of New Jersey, for State of New Jersey and New Jersey Racing Commission).

FISHER, P.J.Ch.

## I

This action requires a determination of the novel issue of whether political contributions proposed by plaintiff New Jersey Thoroughbred Horseman's Association ("the Association") are consistent with the Association's obligation to use a statutorily-created fund ("the Fund") to "aid horsemen." This Fund has had a noteworthy history in our courts since the enactment of the statute which called for its creation.[1] But no court has yet considered the authority of the Association (or its predecessor [2]) to make contributions to political campaigns or for lobbying activities.

As a preliminary matter, defendants State of New Jersey and the New Jersey Racing Commission ("Racing Commission") contend this action should be transferred to either the Appellate

---

[1] *See, Jordan v. Horsemen's Benev. & Protect. Ass'n,* 90 *N.J.* 422, 448 *A.*2d 462 (1982); *Horsemen's Benev. & Protect. Ass'n v. Atlantic City Racing,* 98 *N.J.* 445, 487 *A.*2d 707 (1985); *Horsemen's Ass'n v. Racing Com'n,* 251 *N.J.Super.* 589, 598 *A.*2d 1243 (App.Div.1991); and cases cited in n. 4, *infra.*

[2] The litigation referred to involved New Jersey Division, Horsemen's Benevolent Protective Association, which was the predecessor to the Association.

Division (claiming this action, in reality, seeks review of the Racing Commission's denial of approval) or the Chancery Division, Mercer County (claiming the disputes are governed by a settlement agreement approved in that court 9 years ago). This application also requires a consideration of the troublesome jurisdiction problems previously outlined by the Appellate Division.[3]

## II

The Association is authorized by statute to receive from the operators of New Jersey racetracks a portion of parimutuel funds and to use and distribute such funds for programs designed to "aid horsemen" in New Jersey. *N.J.S.A.* 5:5–66b(1)(d). This statute does not specify the uses to which the Fund may be put and, despite the litigation referred to in the margin,[4] has not been amended to provide further definition to its scope.

The various prior suits have resulted in providing an understanding of the nature of the Fund as well as a blueprint for locating the proper forum for the resolution of disputes. A number of those suits, then pending in the Appellate Division and Chancery Division (Mercer County), resulted in a settlement agreement approved by the Honorable Paul G. Levy on June 5, 1992. The settlement agreement called for the dismissal of those pending suits,[5] and resolved the handling of "bookkeeper's interest" and other interest to be consolidated into a single account

---

[3] *See, New Jersey Horsemen's, supra,* 251 *N.J.Super.* 589, 598 A.2d 1243.

[4] *See,* n. 1, *supra* and n. 4, *infra.*

[5] *In re Appeal of New Jersey Thoroughbred Horsemen's Benevolent Association, Inc.,* Docket No. A–6424–89T2; *New Jersey Thoroughbred Horsemen's Benevolent Association, Inc. v. New Jersey Division, Horsemen's Benevolent and Protective Association,* Docket No. A–383–90T2; *Dennis Heimer, et al. v. New Jersey Division, Horsemen's Benevolent and Protective Association, Inc.,* Docket No. A–913–90T3; *New Jersey, Division of Horsemen's Benevolent and Protective Association, Inc. v. New Jersey Racing Commission,* Docket No. A–2155–90T3.

eventually held by a successor entity (the Association herein).[6] The agreement also describes the scope of disbursements from the Fund which ·may occur "without the approval" of the Racing Commission. The existence of this settlement agreement impacts, so says the Racing Commission, on the scope of relief sought in this case, as well as the proper forum for a resolution of this dispute.

The present dispute arises from the fact that the Association maintains a political action committee (known as Thoropac), which operates for the purpose of informing and educating legislators about issues affecting the horseracing industry. The Racing Commission has regulatory power over the financial activities of the Association.

The Association requested the Racing Commission's approval of the use of $200,000 from the Fund for Thoropac, so that it could make contributions to candidates for office and to lobby politicians regarding horseracing issues and pending or proposed legislation. On September 21, 2001, the Racing Commission concluded that "political contributions do not constitute a legitimate benevolent program." The Racing Commission's entire analysis of that issue turns on its view that only those expenditures which provide "direct tangible" benefits to horsemen are authorized:

> Programs such as health benefits and pension fund contribution provide horsemen with direct tangible benefits. Political contributions do not necessarily result in such benefits. A political contribution is generally provided to assist a legislator in the election process. Thus, legislators, not horsemen, are the beneficiaries of these payments.

*Id.* The Association takes a broader view, claiming in its complaint "the education of politicians and legislatures as to the need of horsemen and the passage of legislation that is favorable to horsemen, and the defeat of legislation that hurts them, is within the scope of the purposes for which [the Association] was organized and is beneficial to horsemen." By way of this suit, the

---

[6] The settlement agreement also provided for the payment of worker's compensation insurance premiums, an aspect not relevant here.

Association claims the Racing Commission's conclusion is "arbitrary, capricious and unreasonable and unduly restrictive of the purposes and goals" of the Association and the statutory scheme. *Id.* The Association also argues that this court is the proper forum for obtaining directions as to the use of the Fund.

## III

To vindicate its contentions, the Association commenced this action on September 28, 2001 soon after the Racing Commission's unfavorable decision. This court entered an order on October 1, 2001, requiring defendants to show cause why the relief sought in the complaint should not be granted. Defendants, via cross-motion, seeks dismissal for lack of jurisdiction or, in the alternative, a transfer either to the Appellate Division or the Chancery Division (Mercer County). In some respects a determination of the proper forum informs the propriety of the proposed expenditures.

### A

As for the conflict over the proper forum, the court has the inestimable guidance of the decision in *Horsemen's Benevolent Protective Ass'n v. Racing Com'n*, 251 *N.J.Super.* 589, 598 *A.*2d 1243 (App.Div.1991).[7] In that action, the court reviewed the history of the Association and the purpose of the applicable statute in determining "whether anything in the statutory scheme creating the Fund evinces a legislative intent to confer upon the Racing Commission exclusive jurisdiction to adjudicate all legal and factual disputes involving control and disposition of the Fund." *Id.*, at 601, 598 *A.*2d 1243. This court need not reinvent the wheel. After thoroughly canvassing the existing law on the subject, the Appellate Division concluded that

---

[7] Because of the similarity of the names of all the prior suits, the case reported at 251 *N.J.Super.* 589, 598 *A.*2d 1243 will hereinafter be referred to as "the Appellate Division's decision" or the "1991 decision."

> [w]hile the Fund defies simple or certain classification, we are satisfied that its attributes are most nearly akin to those of a quasi-public charitable trust for the benefit of a large and indefinite class which, the record suggests, now totals some 6,000 owners, trainers, and employees. The trust res is, of course, the percentage of the purse money so allocated, the settlors are the owners themselves under the statutory scheme, and the trustee is the private non-profit organization receiving and administering the res for the adjudicated public-welfare trust purposes. Thus *the Fund, to the considerable extent to which it constitutes a quasi-public charitable trust, must be deemed to be, as are all charitable trusts, under the general supervisory power of the Chancery Court,* which may be invoked by the Attorney General, a trustee, or by a person having a special interest in it. *[Id.,* at 601–602, 598 *A.*2d 1243 (emphasis added).]

As a result, the Appellate Division found the Racing Commission does not have exclusive jurisdiction to direct or limit the use of the Fund. However, the Appellate Division also concluded that in some respects the Racing Commission has regulatory power concerning the requirement that annual audits be submitted, while at the same time concluding that the "statute is altogether silent as to what remedies are available and to whom and in what forum if either of these agencies or any other specially interested person is dissatisfied with the audit or if the audit is never even filed." *Id.* at 602, 598 *A.*2d 1243. That power, according to the Appellate Division,

> hardly constitutes a vesting of exclusive supervisory or adjudicatory jurisdiction in either agency. Nor does it bespeak an intention to impinge upon the Superior Court's constitutionally conferred "original general jurisdiction throughout the State in all causes." Indeed, that statutory provision may be viewed primarily as either a transfer of the Attorney General's general authority over charitable trusts to the Racing Commission and the State Treasurer, jointly or severally, or as a sharing of that authority by the Attorney General with these agencies. *It patently does not, however, deprive the court of its traditional and inherent power.* [*Id.,* at 602–603, 598 *A.*2d 1243 (emphasis added; citations omitted).]

As a result, the Appellate Division also observed there is a "degree of concurrency" in the jurisdiction of the Chancery Division and the jurisdiction of the Racing Commission. *Id.* at 603, 598 *A.*2d 1243. The Racing Commission "can require that budgets and audits be filed, that spending follow a ratio guideline and that prescribed bookkeeping and record keeping practices be followed" and can "enforce those requirements by administrative penalties," but not every breach constitutes a breach of trust, not every

breach constitutes a violation of the regulation, "and some conduct will do both." *Id.* at 603–604, 598 *A.*2d 1243. In the final analysis, then, "the critical jurisdictional question ... is the nature of the remedy sought for the alleged improper conduct"; if the remedy is "equitable, then jurisdiction may remain in the court ... [i]f regulatory, the primary jurisdiction must be retained by the agency." Further, "[i]f both, then coordination must and can be effected by a variety of techniques including judicial determination of the order of proceedings, voluntary abstention and deference, constituting of the agency as a factfinder for the court." *Id.* at 604, 598 *A.*2d 1243.

## B

■ As a result of this "degree of concurrency" in jurisdiction, a true understanding of the claim is critical in ascertaining the correct forum. If this is one of those areas in which the Racing Commission is entitled to exercise its supervisory powers over the administrative and record keeping aspects of the Fund, then it follows that review of the Racing Commission's determination should occur in the Appellate Division. *R.* 2:2–3(a)(2).[8] If the issue relates to *"whether the fiduciary's expenditures are proper in terms of serving the trust purpose,* are reasonable in amount, and are free from trustee self-dealing and other impropriety arising from trustee conflict," then it is a matter for the Chancery Division. [*Id.* at 605–606, 598 *A.*2d 1243 (emphasis added).]

In this case, the parties dispute whether the proposed political uses of the funds held by the Association are beneficial to horsemen. The Association argues that the proposed expenditures have a benevolent purpose within the intendment of the statute. It claims that the proposed political contributions, in anticipation of the upcoming general election, are worthwhile and beneficial so

---

[8] The rule states: "... appeals may be taken to the Appellate Division as of right ... to review final decisions or actions of any state administrative agency or officer."

that the Association will have, in effect, entree to those individuals who may be elected to important executive and legislative posts. The Association argues that the path to a legislator's attention is paved with money and there has been offered no dispute to that contention. The Association observes that there is pending legislation regarding off-track betting, phone wagering, and the creation of a winter training facility, all which would have the direct or indirect effect of benefiting horsemen. The influencing and educating of legislators as to these issues is, the Association claims, ultimately the way of accomplishing changes or amendments to pending laws, or defeating hostile legislation, all in aid of horsemen. The Racing Commission's conclusory rejection of the Association's application in this regard suggests that these proposed expenditures would not "aid horsemen." Thus, the fundamental dispute is over the authority to use the Fund; such a dispute falls well within the court's inherent jurisdiction over the meaning and distribution of trusts.

## C

As Judge Pressler recognized in the 1991 decision, it is familiar territory for the Chancery Division to consider and give instructions to trustees as to their possession of authority based upon a particular instrument. 251 *N.J.Super.* at 605–606, 598 *A.*2d 1243 ("whether the fiduciary's expenditures are proper in terms of serving the trust purpose ... is a matter for the Chancery Division"). Our Court Rules delineate the nature of actions cognizable in the Superior Court. Numerous provisions relate to the proper Division or Part of the court relating to the actions of trustees or fiduciaries. Among these is *R.* 4:95–2 which provides the most similar description of the nature of the case presented here:

> A summary action pursuant to R. 4:83 may be brought by executors, administrators, guardians or trustees for instructions as to the exercise of any of their statutory powers as well as for advice and directions in making distributions from the estate.

Such actions are most naturally lodged in the Probate Part of the Chancery Division. That these are matters falling with the equity jurisdiction of our Chancery courts has long been the history of our State. *See, e.g., Judge v. Kortenhaus,* 79 *N.J.Super.* 574, 192 *A.*2d 320 (Ch.Div.1963). The statute upon which the creation of this Fund is based exhibits no intent to depart from the approach compelled by the Appellate Division's 1991 decision. Accordingly, it is for the Chancery Division to determine whether the parameters of the use of the Fund expressly permit such disbursements or whether those parameters allow for the exercise of discretion and, if so, whether the proposed disbursements are those which may be permitted through the exercise of that discretion.

Finding that the issue is not to be determined by a review of the Racing Commission's decision, but upon the Chancery Division's view of the power of the Association to make such disbursements of the Fund, defendants' motion to dismiss or for a transfer to the Appellate Division is denied.

## D

Defendants, however, alternatively contend that the action should be transferred to the Chancery Division, Mercer County, urging the significance of the settlement agreement approved by Judge Levy in 1992 and arguing that the cause of action arose in Mercer County and not here.[9] As to the former contention, the court is satisfied that the Mercer County settlement does not play any important role in the present dispute, as will be explained momentarily. As for the place where the cause of action arose, it is observed that the Racing Commission maintains an office at Monmouth Park[10] which is in operation during the Summer

---

[9] *R.* 4:3–2(a)(2) requires that venue of an action "in actions not affecting real property which are brought by or against municipal corporations, counties, public agencies or officials, [be laid] in the county in which the cause of action arose."

[10] Monmouth Park is located in Oceanport, which lies within Monmouth County.

racing season at that location. Accordingly, at the time the Association made application for approval of the expenditures in question, the Racing Commission did have an active office in Monmouth County (even though it is now dormant due to the close of the racing season at Monmouth Park this year). To the extent the location for the arising of this dispute can be definitively stated (considering the nature of the cause of action), Monmouth County is as likely the location of its arising as is Mercer County, if not more so. As a result, it cannot be said that venue was not properly laid in Monmouth County.

■ For the most part, venue is not a jurisdictional issue but rather a question which implicates both the efficient administration of justice and the convenience of the parties. Notwithstanding where venue has been laid, the superior court maintains statewide jurisdiction. *See, N.J. Const.*, Art. 6, § 3, ¶ 2. As a means of efficiently administering justice, our courts are then broken down into different divisions (*i.e.,* Appellate, Law and Chancery) and parts (*i.e.,* General Equity Part, Probate Part, Family Part, etc.) having different primary roles. For example, the Chancery Division, General Equity Part is the appropriate venue for actions in which the principal claim of relief is equitable in nature, *R.* 4:3–1(a); that does not mean, however, that a judge in the Law Division cannot enter injunctive relief or, on the other hand, that a judge of the Chancery Division cannot award damages. The powers of law and equity were long ago merged in the Superior Court. *See, N.J. Const.,* Art. 6, § 3, ¶ 4; *Asbestos Fibres, Inc. v. Martin Laboratories, Inc.,* 12 *N.J.* 233, 96 *A.*2d 395 (1953). The Superior Court nevertheless was divided into divisions and parts in order to foster the gaining of expertise among particular judges as to particular types of cases.

■ As a result, while the proper location of venue remains an important aspect of the administration of justice, it does not rise to the level of a jurisdictional debate. Here, the efficient administration of justice will not be served by a transfer. While it might, at times, be appropriate to transfer to another vicinage because of its

familiarity with the parties or the dispute, such as here, the fact of the matter is that the judge who presided over the actions which led to the settlement agreement is no longer available. Transferring venue to the Chancery Division, Mercer County would mean turning the case over to a judge who is equally unfamiliar with the parties' present and past disputes. Indeed, the parties appear to agree there are no factual disputes to be resolved in this case and that the issue to be decided concerns only the power of the Association to use the Fund for the purposes suggested. That issue has been briefed and argued; there is little more for this court to do than to decide that which has been fully submitted. Changing venue now would merely delay a ruling on the merits and render what has occurred to date a complete waste of time.[11]

For the foregoing reasons, defendants' motion to dismiss or for a transfer of the action is denied in its entirety. With that, the court turns to the merits of the interesting and novel issue presented.

## E

■ In ascertaining the powers of a trustee to carry out the purposes of a trust, it is important to analyze the terms of the trust. In this case, the express authority for the use of the Fund arguably lies in three locations: *N.J.S.A.* 5:5–66b(1)(d), *N.J.A.C.* 13:70–1.30(g), and the 1992 settlement agreement. The parties concede that the statute provides little guidance; it states only that the Fund should be used in order to "aid horsemen." *N.J.A.C.* 13:70–1.30(g) expands on the statute's obscurity by stating that such benevolent programs include, but are not limited to "pension plans, health and life insurance plans, etc." [12] This

---

11 Considering the fact that the Association seeks to make the political contributions in advance of the upcoming general election, the pointless delay which would be caused by the granting of defendants' motion to change venue might very well be tantamount to a denial of the relief sought.

12 This particular aspect of the regulation states in full:

provision hardly advances either party's position. We are not dealing with pension plan, health or insurance concerns. And what the promulgator of the regulation meant by "etc." is not explained.

Both parties have referred to the 1992 settlement agreement for guidance. It is important, however, to recognize that the settlement agreement, by its very terms, is not intended to encompass all uses to which the Fund may be put. In essence, as is relevant here, the settlement agreement does no more than classify the types of disbursements for which the Association need not seek the Racing Commission's approval. It states: "The monies in the Fund may be disbursed for the following programs under the following conditions without approval of the [Racing Commission]". Accordingly, the settlement agreement hardly assists, except inferentially, in defining those uses which are beneficial to horsemen; it only defines *some* of those uses which the Racing Commission concedes are beneficial, because the Racing Commission—by way of that agreement—has expressly declined any interest in interceding in the Fund's use in those areas. Rendering that conclusion somewhat uncertain, however, is subsection B of paragraph 5 which states that the "programs on which funds will be expended *are limited to*" certain expressed items. Because this subsection *falls within the governing provision of paragraph 5*—which declares that the "following programs" may be funded without Racing Commission approval and are "not limited"—the court is compelled to conclude that subsection B does not expressly limit the uses to which the Fund may be put from then into the indefinite future. Moreover, and in consideration of the Appellate Division's 1991 decision, it would seem beyond the power of the Racing Commission to limit those things

---

Funding for benevolent programs, including but not limited to pension plans, health and life insurance plans, etc. will be considered reasonable if such program funding on an annual basis is at least 70 percent of the total statutory allocation. Whether or not a program will be considered a "benevolent program" will be decided upon application to the Racing Commission.

which are in aid of horsemen. The horsemen should be permitted to speak for themselves or at least have a voice in the process. If the Racing Commission was intended to have sole discretion as to the use of the Fund why would the Legislature not have simply made the Racing Commission the trustee of the Fund? While the Racing Commission has supervisory powers and can require that budgets and audits be filed, and enforce its powers through the issuance of sanctions such as fines, license suspensions and other appropriate administrative penalties, it cannot limit the statutory power, albeit unclearly defined, to permit the Association's use of the Fund for programs in "aid of horsemen."

Notwithstanding those limits, the settlement agreement suggests the intentions of the parties as to what might constitute the scope of permissible uses. Beyond referring to pension fund contributions and health care benefits, the parties to the settlement agreement also acknowledged that "education programs for horsemen and their employees, education scholarships, on-track recreational programs for horsemen's employees and charitable contributions" are appropriate expenditures. To that extent, the parties recognize a broader power as to the use of the Fund beyond that which the Racing Commission suggests in its written denial of the Association's request for approval: "Programs such as health benefits and pension fund contribution provide horsemen with *direct tangible* benefits." (emphasis added). Nevertheless, the content of the settlement agreement, while helpful in construing what might be beneficial to horsemen, cannot create a limit on the expressed, albeit unadorned, authority created by the Legislature in *N.J.S.A.* 5:5–66.

What can be gathered from all this, then, is the fact that the attributes of this trust, which, as Judge Pressler observed in the 1991 decision, "def[y] simple or certain classification," render it a "quasi-public charitable trust for the benefit of a large and indefinite class" the terms of which, when silent, are within this court's "traditional and inherent power" to define and direct. 251 *N.J.Super.* at 601–603, 598 *A.*2d 1243. Because the "terms of the trust"

are, to say the least, elusive, it is for the court to determine whether the trustee has discretionary powers to make distributions even when the proposal will not result in a "direct tangible" benefit but only an indirect and, at the present, intangible benefit.

## F

As this discussion indicates, in ascertaining the power of a trustee to take certain action, the first step requires an examination of the trust instrument. Here, the centerpiece of the "trust instrument" is the statute. Arguably, N.J.S.A. 13:70–1.30(g) and the settlement agreement also contain elements of the trust instrument.

In analyzing the terms of the trust, the court's initial approach is simple: if the "power is expressly conferred or denied in unambiguous terms the question is answered." 3 *Scott on Trusts* (1967), § 186 at p. 1497. In such an instance, the trustee is bound by those unambiguous terms. As explained above, none of the certain or even arguable parts of the "trust instrument" unambiguously dictates whether the political contributions or the lobbying efforts suggested are or are not authorized. As a result, it remains within the court of equity's traditional authority to ascertain the scope of power; this inherent authority allows the court "under proper circumstances [to] confer powers upon the trustee which he does not otherwise have, or [the court] may direct him not to exercise powers which he otherwise has." *Id.*

Upon a consideration of the evidence as to the "terms of the trust," as well as the history of the past disputes about the Fund, the court is convinced that this "trust instrument" imbues the trustee (*i.e.*, the Association) with the discretion to act in whatever reasonable manner will "aid horsemen." This discretion would appear not to be mandatory but permissive; that is, the Association is not required to make such disbursements as it presently seeks but may do so if it seems a reasonable and appropriate means of addressing a particular problem of interest to the horsemen's welfare. The court is satisfied from the record and

the importance of the horseracing industry in this State that the use of the Fund is not limited to those things which have a "direct" benefit as declared by the Racing Commission in its decision on this matter, but also those things which may only have an "indirect" benefit. Certainly, the passage of legislation that would be of benefit to horsemen (or the defeat of hostile legislation) is a valid goal to be pursued through the use of the Fund. So long as the choice of expenditures is made "in good faith, from proper motives and within the bounds of a reasonable judgment" [13] the Association's pursuit of such aims is authorized by the statute. The question is whether, with regard to the proposed distributions, the Association is "acting in that state of mind in which it was contemplated" by the statute that it "should act." *Conlin v. Murdock,* 137 *N.J.Eq.* 12, 16, 43 *A.2d* 218 (Ch.1945); *Scott on Trusts, supra,* § 187 at p. 1502. Each proposed expenditure warrants that analysis; the proposed expenditure urged in this case meets that standard.

Neither side has contended that the court needs any other facts or evidence to decide this issue. The Racing Commission, for example, does not contend—without conceding the Association has the discretion to expend funds for political contributions or for lobbying purposes—that the distributions proposed by the Association at this time are unreasonable. Accordingly, this is not a situation where the court would need to hear evidence or testimony as to why the Association feels it is wise to contribute only $5000 to this senate candidate while suggesting a contribution of $37,000 to that senate candidate. Because the Racing Commission has not disputed the reasonableness of those specific contributions, and because the court's own review of the proposed expenditures is that they appear reasonable in purpose and amount, the court need not further question the wisdom of the Association in that respect. The court therefore concludes—with the finding

---

[13] *Judge, supra,* 79 *N.J.Super.* at 587, 192 *A.2d* 320. *See also, Camden Safe Deposit & Trust Co. v. Read,* 124 *N.J.Eq.* 599, 603, 4 *A.2d* 10 (Ch.1939); *Latorraca v. Latorraca,* 132 *N.J.Eq.* 40, 48, 26 *A.2d* 522 (Ch.1942).

that political contributions and lobbying and education expenses are within the Association's discretion to make—that these particular contributions, which were approved by the Association's board of directors, are reasonable manifestations of the use of the Association's discretion.

## IV

Judgment will be entered permitting the Association to make the proposed distributions. It is noted that the Association has raised alternative theories in seeking relief. In light of the foregoing, the court need not address those alternative claims. Counsel for the Association is directed to submit a proposed form of judgment in conformity with this opinion.