753 A.2d 116 (2000)
332 N.J. Super. 140
Madeline MUISE, Individually and as owner and operator of Mediation and Therapy Associates, on behalf of herself and all other individuals and business entities similarly situated, Plaintiff-Respondent,
v.
GPU, INC., its subsidiaries, agents, servants and/or employees, and/or GPU Energy, its agents, servants, and/or employees and John Doe Manufacturers and/or Suppliers, a fictitious name denoting corporations, partnerships, or other business entities who assist or are involved in the delivery of electricity to the consumer and the manufacturers and suppliers of equipment used for the same, Defendant-Appellant.
George J. Tzannetakis, and Paula R. Zaccone-Tzannetakis, husband and wife, Anna Jacoubs, Gerald Hoy and Kathleen Hoy, husband and wife, Lloyd Vaccarelli and Dorothy Vaccarelli, husband and wife, Frank Cracolici, Marmol, Inc., d/b/a Umberto Restaurant, Warren Abrahamsen d/b/a Fairwinds Catering, C.K. Seafood, Inc., d/b/a Bayshore Fishery, Charles Kurica, Jr. and Janice Kurica, husband and wife, Foreign Cars of Monmouth, Inc., Rad Enterprises, Inc., d/b/a Krauzer Convenience Store, and Fair Haven Hardware, Inc., on behalf of themselves and all others similarly situated, Plaintiffs-Respondents,
v.
GPU, Inc. and its Subsidiary Companies, Jersey Central Power & Light Company, GPU Generation, Inc., and GPU Service, Inc., all d/b/a GPU Energy, Defendants-Appellants.
Superior Court of New Jersey, Appellate Division.
Argued May 24, 2000.
Decided June 14, 2000.
*118 Douglas S. Eakeley, for defendant-appellant GPU, Inc. (Lowenstein Sandler, attorneys; Mr. Eakeley, Peter L. Skolnik and Gavin J. Rooney, of counsel; Mr. Skolnik, on the brief).
Frank S. Gaudio, Red Bank and Gerhard P. Dietrich, Fort Washington, PA, for the Muise plaintiffs-respondents and the Tzannetakis plaintiffs-respondents (Miller & Gaudio and Daller Greenberg & Dietrich, attorneys; Mr. Gaudio, Mr. Dietrich, Scott C. Arnette, Red Bank and Alison R. Rohmer, Fort Washington, PA, of counsel; Mr. Dietrich, on the joint brief).
Susan J. Vercheak, Deputy Attorney General, for amicus curiae Board of Public Utilities (John J. Farmer, Jr., Attorney General of New Jersey, attorney; Andrea M. Silkowitz, Assistant Attorney General, of counsel; Ms. Vercheak, on the brief).
Gregory Eisenstark, Deputy Ratepayer Advocate, for amicus curiae Division of the Ratepayer Advocate (Blossom A. Peretz, *119 Ratepayer Advocate, attorney; Mr. Eisenstark and Diane Schulze, Assistant Deputy Ratepayer Advocate, on the brief).
Wilentz, Goldman & Spitzer, Woodbridge, for amici curiae Elizabethtown Water Company, Edison Water Company and Liberty Water Company (John A. Hoffman and Christine D. Petruzzell, of counsel and on the brief).
Eichen, Cahn & Parra, and Lombardi & Lombardi, Edison, for amicus curiae Minning/Elio's (Daniel Epstein and Scott Telson, Edison, on the brief).
Norris, McLaughlin & Marcus, Somerville, for amicus curiae National Association of Water Companies (Walter G. Reinhard, of counsel and on the brief).
LeBoeuf, Lamb, Green & MacRae, Newark, for amicus curiae New Jersey Utilities Association (Stephen B. Genzer, Newark and Colleen A. Foley, on the brief).
Before Judges KING, CARCHMAN and LEFELT.
*117 The opinion of the court was delivered by KING, P.J.A.D.

I
In these actions, consolidated as one class-action lawsuit, plaintiffs sought damages from GPU, Inc., and related entities (defendants) for electric-service outages arising from high demand during a week-long heatwave in July 1999. Plaintiffs attributed the outages to defendants' negligence in operations, maintenance, and planning for a predictable event. Defendants moved without success to dismiss in favor of the primary jurisdiction of the Board of Public Utilities (the Board).
We granted defendants' motion for leave to appeal the denial of their motion to dismiss. R. 2:2-3(b); R. 2:5-6. Defendants argue here that the Board must consider plaintiffs' claims before a court does, in order to preserve the integrity of its oversight functions. Plaintiffs and the Board, as amicus, disagree. The Board asserts that it has finished its investigation of the power outages and has ordered appropriate measures to prevent a recurrence. It declares that trial of this case in the Law Division will not prejudice the Board or the public interest as long as any new issue within its exclusive jurisdiction is referred to it. No such issue is presently identified. Defendants also argue that plaintiffs have no right to a jury trial of their claims.
We conclude that the Law Division judge properly retained jurisdiction over these claims, rather than defer to the Board. We affirm that decision. Future developments may require reference of certain issues to the Board, but not at present.

II
This is the procedural background. On July 20, 1999 the Muise plaintiffs, individual and business customers of the public utility's electrical service, filed a class-action complaint against GPU, Inc., and related entities, alleging damage "as a result of electrical power interruption and/or electrical deficiency and/or power failures and blackouts." They alleged that those defendants failed "to properly and adequately prepare for and anticipate the demand for electricity," and pleaded negligence, breach of contract, breach of warranty, intentional misrepresentation, failure to warn, fraud, and consumer fraud. They sought compensatory damages, treble damages pursuant to the consumer fraud statutes, punitive damages, and a jury trial on all issues. The defendants denied liability and asserted numerous affirmative defenses which included the *120 Board's primary jurisdiction and the court's lack of subject-matter jurisdiction.
On July 22, 1999 the Tzannetakis plaintiffs, who were also individual and business customers of the public utility's electrical service, filed a class-action complaint against GPU, Inc., and other related entities, also alleging damage from the failure of those defendants "to provide safe and reliable delivery of energy in the form of electrical power." They alleged that those defendants should have known that their infrastructure and maintenance were inadequate to furnish service as represented and required. They pleaded many theories of liability, including negligence, strict liability, fraud, misrepresentation, breach of warranty, breach of contract, and consumer fraud. They sought compensatory damages, treble damages pursuant to the consumer fraud statutes, punitive damages of at least $350,000 "per claimant," and a trial by jury "on all issues so triable." The defendants denied liability and asserted the same defenses.
On October 8, 1999 the parties consented to consolidate the Muise and Tzannetakis actions. On October 12, 1999 the judge granted class certification, denied defendants' motion to dismiss in favor of the Board's primary jurisdiction, and denied a motion to dismiss for failure to exhaust administrative remedies. Defendants later abandoned their exhaustion contention.
At the October 12, 1999 hearing, the judge said that he would deny defendants' motion for a stay, which defendants had not yet formally filed, in order to allow discovery and class notification to proceed. On October 18, 1999 the judge memorialized the grant of class certification and the denial of defendants' motions to dismiss. The order defined the class as follows:
All customers of GPU Energy in New Jersey including, but not limited to, customers in Monmouth and Ocean Counties, and all dependents, tenants, employees and other intended beneficiaries of customers of GPU Energy in New Jersey including, but not limited to, Monmouth and Ocean Counties, who suffered damages as a result of the failure of GPU Energy to deliver electricity during the week beginning Sunday, July 4, 1999. The officers, directors and agents of the defendants are specifically excluded from the class. Any persons with claims for personal injury arising out of the power outages are excluded from the class.
The order also appointed the Muise plaintiffs' counsel and the Tzannetakis plaintiffs' counsel as "counsel for the class."
On January 11, 2000 we granted defendants' motion for leave to appeal in order to determine the proper forum for these claims.

III
The Board has the power of "general supervision and regulation of and jurisdiction and control over all public utilities ... and their property, property rights, equipment, facilities and franchises so far as may be necessary for the purpose of carrying out the provisions of this Title." N.J.S.A. 48:2-13. It also has the power to set "just and reasonable standards, classifications, regulations, practices, measurements or service to be furnished, imposed, observed, and followed" by a public utility. N.J.S.A. 48:2-25(a).
The Board's powers include ordering a public utility to comply with laws and ordinances, maintain a "system of accounts" in a prescribed manner, furnish periodic detailed reports, and notify the Board of any accident upon the utility's property "or indirectly arising from or connected with its maintenance or operations." N.J.S.A. 48:2-16. In addition, the Board may "[i]nvestigate upon its own initiative or upon complaint in writing any matter concerning any public utility." N.J.S.A. 48:2-19.
The Board may order a public utility "to furnish safe, adequate and proper service, including furnishing and performance of service in a manner that tends to conserve *121 and preserve the quality of the environment and prevent the pollution of the waters, land and air of this State, and including furnishing and performance of service in a manner which preserves and protects the water quality of a public water supply, and to maintain its property and equipment in such condition as to enable it to do so." N.J.S.A. 48:2-23.
If a management audit, to be conducted every three to six years by Board staff or consultants, demonstrates "that any of the operating procedures or any other internal workings of the affected utility are inefficient, improvident, unreasonable, negligent or an abuse of discretion," the Board may hold a hearing and order the utility "to adopt such new or altered practices and procedures as the board shall find to be necessary to promote efficient and adequate service to meet the public convenience and necessity." N.J.S.A. 48:2-16.4. The Board would also determine the "reasonable and proper costs and expenses" of such measures and recognize them "as proper business expenses." N.J.S.A. 48:2-16.4.
The regulations set technical standards for the construction of new utility facilities and installations. N.J.A.C. 14:3-2.1 to -2.5. They must be "in accordance with standard utility practice," and utilities must "make reasonable efforts to protect the public and its property from injury or damage and shall exercise due care to reduce hazards" that their "equipment and facilities" may pose. N.J.A.C. 14:3-2.1(a).
Under the regulations' general maintenance provisions, a utility "shall have and maintain its entire plant in such condition as will enable it to furnish safe, proper and adequate service." N.J.A.C. 14:3-2.6. It also "shall inspect its equipment and facilities at sufficiently frequent intervals to disclose conditions, if existing, which would interfere with safe, adequate and proper service, and shall promptly take corrective action where conditions disclosed by such inspection so warrant," N.J.A.C. 14:3-2.7(a), and must do so as well for the poles and towers that it owns or uses. N.J.A.C. 14:3-2.7(c). It must "exercise reasonable diligence to avoid interruptions, curtailments or deficiencies ... of service...." N.J.A.C. 14:3-3.9(a). The only specific maintenance provisions require a utility to follow "established practice" for inspecting and maintaining "lamps and street lighting accessories," and not to reinstall a removed transformer, high-tension insulator, or "equipment" without reinspecting it for "safety and serviceability." N.J.A.C. 14:5-1.9.
The regulations mandate that "[p]lanned interruptions for operating reasons shall always be preceded by reasonable notice to all affected customers, and the work shall be planned so as to minimize customer inconvenience." N.J.A.C. 14:3-3.9(c). There is no provision in the statutes or regulations to penalize a utility which fails to give such notice. In the event of an unplanned service interruption or "deficiency," the utility must restore service "as promptly as possible consistent with safe practice." N.J.A.C. 14:3-3.9(a). Utilities must also keep records of "major" interruptions "in a manner suitable for analysis for the purpose of minimizing possible future interruptions." N.J.A.C. 14:3-3.9(b).
In 1999, defendants provided electric service to 988,000 customers in two large areas within New Jersey, a northern region comprising all or part of eight counties and a southern region comprising all or part of five other counties. Their tariff covering the period contained two provisions with representations about the continuity of service:
4.01 Continuity of Service: The Company will use reasonable diligence to provide a regular and uninterrupted supply of service, but should the supply be interrupted, curtailed, or discontinued by the Company for any of the reasons set forth in Section 8 of these Standard Terms and Conditions, or should the supply of service be interrupted, curtailed, deficient, defective or fail by reason of any natural disaster, *122 accident, act of a third party, strike, legal process, governmental interference... or other cause whatsoever beyond its control, the Company shall not be liable for any loss or damage, direct or consequential, resulting from [it].
8.01 Work on Company's Facilities: The Company may, upon reasonable notice when it can be reasonably given, suspend, curtail, or interrupt the supply of service to a customer for the purpose of making repairs, changes, or improvements to or in any of its facilities either on or off the customer's premises.
The power outages which generated this case occurred from July 3 through July 8, 1999 (the period). A July 23, 1999 report from defendants to the Board on the "weather related electric utility outages" outlined the specific problems defendants had reported relating to the outages, including the substations affected, and the daily repair work performed during the period. It stated the number of customers who were "out of service," or who suffered a shorter or "rotating" service interruption, as fewer than 100 on July 3, 1999, 1500 on July 4, 1999, 12,000 on July 5, 1999, 105,000 on July 6, 1999, 24,200 on July 7, 1999, and 23,700 on July 8, 1999. The defendants' report also described the models defendants had used for predicting service demand.
On August 2, 1999 the Board sent defendants a notice that it was beginning an investigation. On August 9, 1999 the Department of Law and Public Safety asked defendants to submit certified answers to numerous questions about their operations, infrastructure, maintenance, and contingency planning in connection with the "power problems and outages" during the period. The questions focused on defendants' operations and maintenance practices, the impact of the outage on operations, defendants' responses, and defendants' knowledge of past troubles or problems experienced by other utilities in similar situations. The questions also asked defendants to name the hospitals "affected by outages or interruptions of electrical service," to provide "an hourly profile of the number of customers out of service" during the period, and to identify the "areas" affected by "rolling blackouts," along with the exact duration of the blackouts and the number of customers in each area.
On August 10, 1999 the Board requested proposals from private consulting firms to conduct an investigation of defendants and other utilities. The investigation's objective was to provide results the Board could use, in conjunction with information gathered by its staff, in determining "whether New Jersey's Electric Utilities under the Board's jurisdiction are providing safe and adequate service now or will be able to provide it in the future based on the far reaching changes taking place in the electric industry." The attached outline indicated that all proposals were to address the utilities' transmission and distribution systems, and their power generation and "supply planning."
On September 1, 1999 the Board ordered its own investigation to proceed. During that same month, Stone & Webster Management Consultants developed a response to the Board's request for proposals. On November 8, 1999 Stone & Webster presented the proposal to the Board and projected the ability to submit a final report on February 22, 2000. The Board selected Stone & Webster to perform the investigation.
We granted leave to appeal on January 11, 2000 to review Judge Chaiet's decision to retain the matter for trial in the Law Division.
On April 28, 2000 the Board issued an order accepting the final report of its staff on whether defendants and the other investigated utilities "had provided safe, adequate and proper service during the July 1999 heat wave event." The order did not recite the staff's conclusion but it did direct defendant and the other utilities to follow the staff's recommendations, which *123 it set forth. These recommendations included numerous measures for improving the ability to assess the extent of an outage, which the utilities were to "substantially implement" by December 31, 2000 and other measures for communicating with government officials and customers, which had no target date for implementation. There were also specific "technical recommendations," directed to defendants alone, for improving their "circuit revamping program," and for upgrading certain cables and related installations to improve reliability. These had no target date for completion. The order implied that the recommendations reflected the staff's assessment of the effectiveness of the recommendations contained in "the Board's prior Reliability and Storm Reports" of December 1997 and December 1998, but it did not indicate the findings or conclusions of those reports.
On May 1, 2000 the Board issued an order addressing the adequacy of defendants' performance during the period. The Board stated that the combination of weather conditions and increased business activity due to the holiday weekend "created an unprecedented demand on GPU's system, 7.5% higher than the prior peak of 1988," which according to defendants' and PJM's forecasts would not occur until 2004. (PJM "refers to the Pennsylvania-New Jersey-Maryland interconnection, a pooled power cooperative used by utilities in those three states." In re Petition of Atlantic City Elec. Co., 310 N.J.Super. 357, 362 n. 2, 708 A.2d 775 (App.Div.1998).) The order adopted Stone & Webster's report, which found that the outages were "primarily attributable to" the failure of two transmission transformers at the Red Bank substation which were similar in size to eighty-four others which had "performed as expected." On that basis, the Board found that "there is not a prima facie case demonstrating that overall GPU provided unsafe, inadequate or improper service to its customers." However, the Board did consider the outages "significant," because up to 105,000 of defendants' 988,000 customers were without power on the same day during the period. It believed that "GPU can improve its reliability from its decision-making process down to and including its maintenance program, record-keeping, and restoration performance and achieve measurable results for improved reliability." It further believed that "GPU also must re-examine its workforce adequacy."
The Board's order observed that defendants had responded to the outages and the Board's investigation by accelerating their capital-improvement projects for the years 2000, 2001, and 2002. The Board expressed three main areas of concern: defendants' decision to defer from 1998 to 2000 the installation of replacement transformers for Red Bank which had already been purchased; "inaccurate and inadequate inspection and test records" for the transformers in Red Bank that failed; and "diminished levels of workforce," as shown by the high average age of employees in certain maintenance positions, the absence of apprenticeship programs to train new ones, and "overall outage restoration time statistics" that were "poor." The order contained numerous provisions for defendants to improve maintenance, operations, planning, and workforce development, with the Board to monitor "on an ongoing basis" defendants' compliance with this and prior orders. Some of the provisions required that defendants complete the work or furnish a report or plan by specific dates, which ranged from June 1, 2000 to January 31, 2001.
The BPU's May 1, 2000 order touched on two other matters. The first was the Legislature's mandate for the Board to prepare a new regulatory regime to reflect "the establishment of full retail competition" in electric service, which the Board did not relate to the other subjects of the order set forth above. Perhaps, the Board meant to suggest that there was no reason to view that deregulatory mandate and the terms of the order as in conflict. The *124 second was the existence of this Law Division action, which the Board did not regard as inconsistent with its own needs and functions, as long as the court remained "mindful of areas as they develop in which the Board's expertise may be necessary." The May 1 order stated, in pertinent part:
We believe that by issuing this Order, monitoring GPU's compliance, and continuing to establish reliability standards, this Board is appropriately exercising its essential jurisdiction over this utility concerning outages and assuring that the utility provides reliable power to the public.... GPU will have to comply with any and all requirements that are the result of the reliability study now underway. We believe that in the circumstances herein this is the soundest use of the Board's resources, the approach best suited to our duty to the public to regulate utilities. We are confident that in the Superior Court litigation, the parties and the Court will be mindful of areas as they develop in which the Board's expertise may be necessary. [Emphasis supplied.]
In that light, and because of its general finding that defendants had not provided unsafe, inadequate, or improper service, the Board saw no reason at this juncture to take further action. Thus, the Board declined to exercise any "primary jurisdiction."

IV
Defendants claim that the Law Division judge erred by failing to defer to the Board's primary jurisdiction to make all the factual findings concerning plaintiffs' claims. They argue that the judge mistakenly believed that plaintiffs' claims did not involve the interpretation of the regulations or defendants' tariff, when the claims actually represented the regulatory issue of whether defendants had acted with "reasonable diligence" to provide "safe, adequate and proper service," and that such questions come under the Board's exclusive jurisdiction. They also argue that the reasonableness of their preventive measures can only be judged as part of the operational requirements the Board had decided to impose as the proper balance between serving the public need while allowing a reasonable rate of return under the tariff. Defendants argue that the Board had special, indeed preemptive, competence to judge the reasonableness of their preventive measures, and that judicial fact-finding would be duplicative at best while risking encroachment on the Board's ability to exercise its essential responsibilities.
Defendants also claim that the court erred by overlooking the importance of the Board's primary jurisdiction in the Legislature's scheme of regulating public utilities. They argue that a proliferation of court cases with disruptive implications for utilities' operations will destroy the uniformity of standards and legal interpretations which the Legislature has charged the Board with ensuring.
Plaintiffs argue that they have a common-law right to bring a tort damage action, that such actions traditionally are heard in court, and that the silence of the Board's enabling legislation on the question of customer tort claims means that the Legislature did not intend to preclude judicial jurisdiction. Plaintiffs further argue the exercise of primary jurisdiction is discretionary; even when a court decides to defer, the expertise to which it defers is an agency's ability to interpret its enabling act and regulations. Plaintiffs urge that the judge properly found that he did not need to interpret any statute or regulation to decide this case. Plaintiffs assert that judicial jurisdiction is concurrent with agency jurisdiction, so the Board's separate investigation here did not divest the court of jurisdiction. Plaintiffs contend that the Board now conclusively has conceded that it lacks jurisdiction over cases "where plaintiffs seek damages as a result of a power outage."
*125 The Board, appearing as amicus, R. 1:13-9, declares that it has finished its investigation of the events in issue, and does not need to continue exercising jurisdiction concerning them. It argues that primary jurisdiction is limited to preserving the prerogatives which the Legislature delegated within the Board's area of special expertise and that such jurisdiction does not divest courts of the authority to consider the types of claims for which a non-administrative remedy is available. The Board asserts that any possible conflict between its post-investigation monitoring and enforcement activity and the exercise of Superior Court jurisdiction is too speculative to require judicial deference at this time. The Board is satisfied to rely on the likelihood that the judge and the parties will identify issues which arise and are within its exclusive jurisdiction.
Plaintiffs make a similar argument: they admit that "certain discrete and collateral issues may arise during the course of this litigation which would require deference to or at least input from the BPU," but then add, as does the Board, that because those issues cannot be predicted now and because a trial court can be trusted to identify them when they arise, the judicial action should proceed.
The Ratepayer Advocate makes arguments similar to plaintiffs'; she adds that primary jurisdiction does not apply when an agency is unable to provide full relief, or when an agency's responsibility to foster the financial health of one party prevents neutrality, and that appropriate deference to the Board's expertise is afforded by simply admitting its staff report into evidence in the court proceeding. The staff report should not have preclusive effect, because the consultants on whom the staff relied were (1) identified with defendants' industry rather than neutral, (2) not charged with investigating plaintiffs' particular claims, and (3) not required to accept or reflect any input from plaintiffs. The Ratepayer Advocate also argues that there is a conflict of interest for the Board, which is charged with ensuring utilities a fair return on their investment, to adjudicate damage claims against defendants on which it would have to compel payment from utility revenues. The Ratepayer Advocate further urges that a court ruling will not conflict with the Board's authority to investigate and compel improvements in defendants' installations and operations, and asserts that the Board has not issued any standards or specific procedures for maintenance or prevention of the sort that defendants claim would be threatened by inconsistent court rulings. Finally, the Ratepayer Advocate argues that any preference for primary jurisdiction must be weighed against the disadvantages of delay.
The Law Division judge characterized primary jurisdiction as posing the question of whether the complaints presented issues "that require the special competence of an administrative agency." He found they did not because the issues were "whether GPU acted reasonably in supplying electricity and whether [GPU] breached their duty to their customers," and those issues "do not involve the interpretation of the tariff, nor do they concern the rates and regulations of the electricity industry nor the interpretation thereof." In addition, in the context of rejecting the motion that defendants made to dismiss for failure to exhaust administrative remedies and have since abandoned, the judge found that the Board's expertise was "not critical" for addressing the "basic concepts of negligence" which will govern this case, and that the court could not override the Board's articulated disinclination to "resolve the damage claims in this particular matter." The judge added that he was retaining jurisdiction to "give those who have been damaged an even-sided forum to resolve ... those claims."
We do not owe deference to the Law Division judge's determination of the legal question of whether the Board has primary jurisdiction. We are not bound by a trial-level judge's "construction of the *126 legal principles." Lombardo v. Hoag, 269 N.J.Super. 36, 47, 634 A.2d 550 (App.Div.1993), certif. denied, 135 N.J. 469, 640 A.2d 850 (1994). "A trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty v. Township Comm. of Manalapan, 140 N.J. 366, 378, 658 A.2d 1230 (1995).
Where the Board has issued its opinion finding it had fulfilled its statutory responsibilities and there was no current prospect of identifying an issue which would suggest it ought to retain jurisdiction, those findings are entitled to deference. The agency has the authority to interpret its enabling legislation, and the discretion to determine the scope of its mandate and the means needed to fulfill it. "The grant of authority to an administrative agency is to be liberally construed to enable the agency to accomplish the Legislature's goals," Gloucester Cty. Welfare Bd. v. State Civil Serv. Comm'n, 93 N.J. 384, 390, 461 A.2d 575 (1983), and the agency's construction of its enabling act "will prevail" if not plainly unreasonable, Merin v. Maglaki, 126 N.J. 430, 437, 599 A.2d 1256 (1992). When such a "quasi-legislative" decision reflects "agency expertise," we must "accord due deference to the policy views of the agency." In re Bergen County Bd. of Chosen Freeholders v. Bergen County Prosecutor, 172 N.J.Super. 363, 369, 412 A.2d 130 (App.Div.1980).
In this case, the Board presently is not asserting its prerogative of statutory interpretation of areas the Legislature declared to be within its exclusive jurisdiction due to its special expertise but rather asserts a factual conclusion the events in issue raise only ordinary questions of negligence, the type no participant in this appeal argues are within its special expertise. The Board's assessment that judicial jurisdiction does not currently appear to infringe on its statutory mandate merits the type of deference the above authorities recommend.
The Board's present position accords with the extant case law on primary jurisdiction. Primary jurisdiction is defined as the circumstance in which a "court declines original jurisdiction and refers to the appropriate body those issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." Daaleman v. Elizabethtown Gas Co., 77 N.J. 267, 269 n. 1, 390 A.2d 566 (1978). The doctrine is related to the practice of requiring the exhaustion of administrative remedies. Boldt v. Correspondence Management, Inc., 320 N.J.Super. 74, 83, 726 A.2d 975 (App.Div.1999) (quoting Boss v. Rockland Elec. Co., 95 N.J. 33, 40, 468 A.2d 1055 (1983)). In primary jurisdiction, "the case is properly before the court, but agency expertise is required to resolve the questions presented"; by contrast, when a court relies on exhaustion, it "is saying that the case ought to have been brought before the administrative agency in the first place." Id. at 83-84, 726 A.2d 975. See Village of Ridgefield Park v. New York, S & W Ry. Corp., 318 N.J.Super. 385, 405-07, 724 A.2d 267 (App.Div.), modified, 163 N.J. 446, 750 A.2d 57 (2000).
One purpose of primary jurisdiction is to allow an agency to apply its expertise to questions which require interpretation of its regulations. IPCO Safety Corp. v. WorldCom, Inc., 944 F.Supp. 352, 357 (D.N.J.1996); Campione v. Adamar of N.J., 155 N.J. 245, 264, 714 A.2d 299 (1998). For example, Daaleman was a class action in which the plaintiffs alleged that the utility overbilled by overstating an item permitted under the tariff. 77 N.J. at 268, 390 A.2d 566. The Court found that the allegations did not satisfy the Consumer Fraud Act, that the only remaining issue was whether the tariff permitted the charge in issue, and that an issue of tariff interpretation was within the Board's expertise and its exclusive jurisdiction. Id. at 271-73, 390 A.2d 566. In Glen View Dev. Co. v. Public Serv. Elec. & Gas, Co., 57 N.J. 304, 306, 271 A.2d 903 *127 (1970), the only dispute was whether the utility, rather than the developer, had to pay to satisfy the municipal requirement that electrical lines to the development be placed underground, because underground lines were necessary for safe and adequate electric service. The Court held that technical expertise needed to determine the requisites of safe and adequate service placed the issue within the Board's exclusive jurisdiction. Id. at 307, 271 A.2d 903; see also In re Penn Cent. Passenger Station, 57 N.J. 400, 402-04, 273 A.2d 42 (1971) (order for station improvements was within the Board's exclusive jurisdiction to determine the requirements of safe and reliable service).
The other main purpose of primary jurisdiction is to preserve uniformity in the interpretation and application of an agency's regulations. The Campione Court explained this purpose in the context of legalized gambling, an industry regulated as comprehensively as a public utility.
The pervasiveness of the regulatory scheme controlling the casino industry indicates that the Legislature intended to invest the [Casino Control Commission] with primary jurisdiction to regulate the casino industry. To the extent that the resolution of a plaintiff's claim depends on an interpretation of the Act or administrative regulations, the CCC should have the first opportunity to provide that interpretation. A referral to the CCC should assure the resolution of the controversy consistent with the views of the entity best positioned to consider the matter. Retaining primary jurisdiction in the courts could dislocate the intricate regulatory structure governing a sensitive industry. Permitting courts and juries across the State to interpret statutory and administrative regulations could introduce confusion where uniformity is needed. The lack of uniform interpretations, in turn, could effect the stability of the industry.
[Campione, 155 N.J. at 264, 714 A.2d 299.]
The general test for when a court should defer to an agency's primary jurisdiction is: deference is appropriate only if "to deny the agency's power to resolve the issues in question" would be inconsistent with the "statutory scheme" which vested the agency "with the authority to regulate [the] industry or activity" it oversees. United States ex rel. Haskins v. Omega Inst., Inc., 11 F.Supp.2d 555, 561 (D.N.J.1998). We recently have described four prongs for the test:
The factors to be considered in deciding whether to invoke the doctrine include 1) whether the matter at issue is within the conventional experience of judges; 2) whether the matter is peculiarly within the agency's discretion, or requires agency expertise; 3) whether inconsistent rulings might pose the danger of disrupting the statutory scheme; and 4) whether prior application has been made to the agency.
[Boldt, 320 N.J.Super. at 85, 726 A.2d 975 (citing IPCO, 944 F.Supp. at 356).]
But, primary jurisdiction cannot be invoked when the claim is outside the agency's jurisdiction, or when the remedy for such a claim is outside the agency's power. In Brooks v. Public Serv. Elec. & Gas, 1 N.J.A.R. 243, 243-44 (1981), the petitioner, a customer of the utility, filed a court action claiming damages for the utility's negligence in failing to restore electric service within a reasonable time following a hurricane and in not notifying him. The court transferred the matter to the Board, on the ground that the Board had jurisdiction "of a dispute concerning `the supplying or nonsupplying of power.'" Id. at 243-44. The Board transferred it to the Office of Administrative Law as a contested case. The administrative law judge found that the Board lacked statutory authority "to decide common law tort actions in any respect," that the Legislature could not constitutionally grant such authority by statute, and that any tariff would be "constitutionally defective" to the extent *128 that it was "found to control, by its terms, the determination of a common law tort action." Id. at 244-46. The question of the utility's duty should be resolved by the common law and a jury, rather than by N.J.A.C. 14:3-3.9's standards for providing and restoring service and the coordinate tariff provisions. Id. at 246. Those principles would be no different if the case were a class action, because the amount of damages which the utility might have to pay could not defeat "constitutional jury trial rights." Ibid.
Defendants attempt to distinguish Brooks as involving a singular, simple negligence claim which did not implicate Board standards or policy because, unlike in the cases before us, the plaintiff made no assertions about the utility's system-wide facilities or operations. An inquiry into the operational, construction, or maintenance mistakes which deprived one customer of electric service perhaps may be different in nature, not just in scope, from an inquiry into how such mistakes deprived many customers of electric service. Nonetheless, as Brooks indicates, the nature of a plaintiff's claim is not diluted simply because there are many plaintiffs with such claims. 1 N.J.A.R. at 246.
When a claim presents some issues that are within an agency's special expertise and others which are not, the proper course is for the court to refer the former to the agency, and then to apply the agency's findings or conclusions to its determination of the remaining issues. Our courts have repeatedly followed this approach. In Boss, which concerned a utility easement across private property, the Court found that the question of how much tree removal within the easement was required for the utility to provide safe and reliable service, while at the same time avoiding an infringement of the property-owner's rights which would amount to a taking, was a contested factual issue within the Board's expertise. 95 N.J. at 41-42, 468 A.2d 1055. The Court remanded for the trial court to refer that question to the Board for "fact finding," and then to apply the Board's findings "against the legal issues to be resolved" in reaching a final decision. Ibid.
Boldt was a class-action suit in which we took the same approach. The class-action plaintiffs in that case sought to recover overcharges by physicians and by medical facilities for providing copies of medical records. 320 N.J.Super. at 77-78, 726 A.2d 975. They also sought injunctions and damages under the Consumer Fraud Act. There were regulations for the copying fees which physicians and medical institutions could charge. We found that the physicians' facial violation of the $1-per-page limit which the regulations set on charges by physicians did not raise any issue of how to interpret the regulations, so the plaintiffs could proceed with their claims against the physicians in court without exhausting their administrative remedies, and we reversed the dismissal of the complaint. Id. at 79-81, 726 A.2d 975.
However, the regulations allowed medical institutions to charge a copying fee "based on actual costs," id. at 81, 726 A.2d 975, which implicated both "the complexities of hospital cost structures" which required agency expertise to understand, as well as the uniformity of "definition and application," an issue only an agency determination could answer. Id. at 86-88, 726 A.2d 975. We concluded the interests of justice required referral of the question of the medical institutions' costs to the agency under the primary jurisdiction doctrine, with the trial court to apply the agency's findings to the plaintiffs' overcharge claims. Id. at 87-88, 726 A.2d 975.
In Campione, where the plaintiff claimed a casino discriminated against him for counting cards, 155 N.J. at 249, 714 A.2d 299, the Court held that there was a common-law cause of action for discrimination within the jurisdiction of the Superior Court. Id. at 266, 714 A.2d 299. However, on the particular question of whether the Casino Control Commission's regulations "implicitly permitted casinos *129 to apply a separate set of rules to card counters seated at the same table as other patrons," the Court directed the Law Division to remand to the Commission "so that the agency may interpret its own regulations," the "kind" of issue that is "especially suited" for primary jurisdiction. Ibid.
The federal courts have addressed whether a court should allow an agency which has primary jurisdiction to proceed first. When the issue is how to apply a regulation, it is appropriate for a court to "postpone such a decision to allow an administrative agency to make the initial decision" when doing so will serve the purposes of primary jurisdiction, which generally are the "[u]niformity of regulations and the use of the expert and specialized knowledge of the agency." Shell Oil Co. v. Nelson Oil Co., Inc., 627 F.2d 228, 232 (Temp.Emer.Ct.App.), cert. denied, 449 U.S. 1022, 101 S.Ct. 590, 66 L.Ed.2d 484 (1980).
Even when primary jurisdiction applies, the doctrine does not confer exclusive jurisdiction on an agency, with the attendant effect of limiting cognizable remedies to those within the agency's authority. On the contrary, a court can consider all judicial remedies, including damages, which are beyond the agency's authority; a legislative intent to defeat them will be inferred only if the Legislature has "explicitly limited the availability of that remedy or relief." Boldt, 320 N.J.Super. at 87, 726 A.2d 975 (citing Campione, 155 N.J. 245, 262, 714 A.2d 299, and Lally v. Copygraphics, 173 N.J.Super. 162, 178-79, 413 A.2d 960 (App.Div.1980), aff'd, 85 N.J. 668, 428 A.2d 1317 (1981)). The Campione Court held that the Casino Control Commission had primary jurisdiction "to resolve issues concerning the interpretation of the relevant statutes, regulations, and a casino's internal controls, but that the Legislature "did not intend to prevent patrons from seeking vindication of common-law claims in the courts." 155 N.J. at 260, 714 A.2d 299. The Legislature "may vest an administrative agency with exclusive primary jurisdiction over common-law claims," but only if it does so expressly, and by "explicitly" granting the agency the power to "award damages in private matters." Id. at 260-62, 714 A.2d 299.
In Boldt, while the agency had primary jurisdiction to determine whether the medical institutions had in fact overcharged, it did not have the authority to award damages for overcharging. There was no indication that the Legislature intended to divest the plaintiffs of the right to such common-law damages. 320 N.J.Super. at 87-88, 726 A.2d 975. For that reason, the agency could not be regarded as having exclusive jurisdiction; instead, the trial court would take the agency's findings on "actual costs" and use them in determining damages. Id. at 88, 726 A.2d 975. Of particular interest perhaps, in the case before us, is that the damages to the plaintiffs are quite varied, perhaps almost unique to each plaintiff, and do not share a common quality, like copying costs.
In New Jersey Div., Horsemen's Benevolent Protective Ass'n v. New Jersey Racing Comm'n, 251 N.J.Super. 589, 598 A.2d 1243 (App.Div.1991), we found that the Racing Commission did not have exclusive jurisdiction over the claim. The Commission's enabling statute conferred the supervisory power of compelling the submission of audits of certain charitable trusts, but the statute was "altogether silent as to what remedies are available and to whom and in what forum" when the Commission failed to exercise that power, such as by failing to enforce a charitable trust. Id. at 602-03, 598 A.2d 1243. The statute "hardly constitute[d] a vesting of exclusive supervisory or adjudicatory jurisdiction in" the Commission, and it could not be said to "bespeak an intention to impinge upon the Superior Court's constitutionally conferred `original general jurisdiction throughout the State in all causes,'" given its silence on the point and the fact that matters of trust enforcement were within the recognized expertise of the Chancery Division *130 and outside the special competence of the Racing Commission. Id. at 603-06, 598 A.2d 1243.
In terms of the case before us, these authorities suggest that certain questions about the provision of safe and adequate electric service are within the Board's exclusive jurisdiction, whereas customer damage claims against defendants for the negligent failure to provide such service are not. The Board's findings about whether defendants satisfied the regulations and complied with its orders could be probative of whether they had been negligent, but not determinative of the issue. Because the Board's findings would not control, the Board did not have exclusive "primary" jurisdiction over these damage claims. Indeed, the Board lacked authority to consider the remedy of damages at all. The Legislature did not explicitly provide that the Board's lack of authority to award damages had the effect of divesting plaintiffs of that remedy. This lack of the Board's authority is an additional reason these claims belong in a court. No controlling principle suggests that the court was compelled to let the Board's investigation proceed first, but that question is moot because the Board has now declared its task concluded and did so during the pendency of this appeal.
We affirm Judge Chaiet's conclusion that the Board did not enjoy primary jurisdiction, or exclusive jurisdiction, over this damage action for ordinary negligence. On the remand, we direct the Law Division judge to grant intervenor status to the Attorney General and the Ratepayer Advocate. R. 4:33. Both have expressed a keen desire to follow this matter on remand.
Obviously, we are loathe to predict the nature of the issues which may arise on the remand which could trigger a legitimate desire on the part of defendants or amici to pursue a renewed application for transfer of discrete issues for consideration by the Board under the doctrine of primary jurisdiction. Such issues may surface on defendants' anticipated motion for summary judgment upon completion of discovery. Any such application for transfer to the agency will be for the Law Division judge to consider within the contours of the case law we have discussed and the issues which emerge upon the remand. We add that the Law Division judge must decide in the first instance just what weight and validity to give the Board's findings and conclusions in its May 1, 2000 order. We regret that the matter at the moment is too abstract and novel for us to provide the judge with any more precise guidance.

V
Finally, we consider defendants' claim that plaintiffs have no right to a jury trial. This was not ruled upon in the Law Division. We deem the issue important and consider it originally. R. 2:10-5.
Defendants urge that there is no common-law relationship between the public and a regulated public utility, only that provided in the tariff. Thus, there is no recognition of a duty whose breach could support a cause of action with a right to a jury trial.
Plaintiffs argue that they have a state constitutional right to a jury trial for their common-law negligence and contract causes of action. They contend that defendants focus too narrowly in characterizing this action as a uniquely modern "class-action against a utility," rather than one of a more prosaic nature, the class members' underlying tort and contract claims. The Ratepayer Advocate supports the plaintiffs' contention.
This issue has two components: immunity and right to a jury trial. Public utilities do not enjoy a general tort immunity. Weinberg v. Dinger, 106 N.J. 469, 472, 524 A.2d 366 (1987) (abrogating the immunity of private water companies from customer damage claim for negligent failure to provide sufficient water pressure at *131 fire hydrant, except for certain subrogation claims); Ebert v. South Jersey Gas Co., 260 N.J.Super. 104, 106-10, 615 A.2d 294 (Law Div.1992) (declining to apply the subrogation exception to Weinberg`s abrogation of immunity), rev'd on other grounds, 307 N.J.Super. 127, 704 A.2d 579 (App.Div.1998), aff'd, 157 N.J. 135, 723 A.2d 599 (1999). In allowing the negligence claims to proceed, the Weinberg Court addressed only the legitimacy of imposing on private water companies a duty to customers to avoid a negligent failure to provide sufficient hydrant pressure, despite the absence of such a provision in their tariffs, and whether such a duty would upset the existing allocation of responsibility between water companies and customers to take reasonable fire-prevention measures. 106 N.J. at 473-95, 524 A.2d 366. The Court did not imply that the case should be remanded to the Board for an initial finding on whether the utility had satisfied the regulations and other administrative standards. Ibid.
Years before Weinberg, our Supreme Court rejected the proposition which defendants advance here, namely, that if a utility is in compliance with the Board's regulations and other standards for installations, operations, and maintenance, then as a matter of law it cannot be held liable for a service outage which occurs despite such compliance. In Black v. Public Serv. Elec. & Gas, Co., 56 N.J. 63, 76-77, 265 A.2d 129 (1970), the utility was in compliance with the National Electrical Safety Code, which the Board had "approved." The Court held that such compliance failed to establish as a matter of law that the utility could not be held liable, because the industry standards were minimums for the handling of electrical wires that "do not establish the complete duty of the utility under all circumstances." Ibid.
Nor is there authority for defendants' proposition that the tariff as a matter of law states the entirety of the relationship between a utility and its customers and is the sole source of the duties between them, much less the proposition's implication that a tariff can defeat or eviscerate common-law causes of action for negligence or breach of contract simply by failing to mention them. The chief cases defendants rely upon, In re Application of Borough of Saddle River, 71 N.J. 14, 29, 362 A.2d 552 (1976), and Essex County Welfare Bd. v. New Jersey Bell Tel. Co., 126 N.J.Super. 417, 421-22, 315 A.2d 40 (App.Div.1974), do not go this far. These cases say only that a tariff is "the law" and "not a mere contract," with the effect that subscribers are bound by it whether or not they are aware of its provisions. Ibid. They do not address the meaning of a tariff's omissions, much less suggest that they can serve to preclude rights customers would otherwise have at common law. These authorities do not preclude a judicial trial.
Turning to whether plaintiffs have the right to a jury in a civil trial, that right is guaranteed only for causes of action at law, not at equity. Even among causes at law, it is limited to those for which the common law provided such a right at the time "when the New Jersey Constitution was adopted." State v. Anderson, 127 N.J. 191, 207, 603 A.2d 928 (1992); accord, State v. One 1990 Honda Accord, 154 N.J. 373, 377-78, 712 A.2d 1148 (1998), Weinisch v. Sawyer, 123 N.J. 333, 342-33, 587 A.2d 615 (1991), and Shaner v. Horizon Bancorp, 116 N.J. 433, 447, 561 A.2d 1130 (1989). Our Supreme Court has expressly declined to decide whether the guarantee references the common law as it stood in 1947 when the current constitution was adopted, in 1844 at the adoption of our earlier constitution, or in 1776 at the adoption of the original constitution. Ibid. Cf. Insurance Co. of N. Am. v. Anthony Amadei Sand & Gravel, Inc., 162 N.J. 168, 175-76, 742 A.2d 550 (1999) ("Only those actions that triggered the right of a jury trial that predated our State Constitutions, and those that were created anew with enactment of New Jersey's 1776 Constitution, the 1844 Constitution, or the 1947 *132 Constitution serve as the basis for that constitutional right today." (citing One 1990 Honda Accord, Anderson, Weinisch, and Shaner)). See contra Town of Montclair v. Stanoyevich, 6 N.J. 479, 485, 79 A.2d 288 (1951) ("The right of trial by jury protected in each of our constitutions is the right as it existed at common law and remained on July 2, 1776."); Ward v. Merrimack Mut. Fire Ins. Co., 312 N.J.Super. 162, 165, 711 A.2d 394 (App.Div.1998) (same); Manetti v. Prudential Property & Cas. Ins. Co., 196 N.J.Super. 317, 320, 482 A.2d 520 (App.Div.1984) (same).
Fortunately, in One 1990 Honda Accord, 154 N.J. at 378, 712 A.2d 1148, the Court observed that "[a]s a practical matter, acceptance of one constitution or another probably does not affect the recognition of the right." At any rate, for determining the right to a civil jury, our courts look to the nature of the most appropriate remedy, not the nature of the cause of action. Weinisch, 123 N.J. at 343-45, 587 A.2d 615 (finding no right to a jury, because appropriate relief for insurance agent's negligence was reformation of the contract, which was an equitable remedy); accord, Insurance Co. of N. Am., 162 N.J. at 176-77, 742 A.2d 550. The remedy of damages is legal in nature, and as such our courts have held that it entitles the claimant to a jury trial. Ward, 312 N.J.Super. at 167, 711 A.2d 394 (contract damages); Kenney v. Scientific, Inc., 213 N.J.Super. 372, 375, 517 A.2d 484 (App.Div.1986) (tort damages); Associated Metals Minerals, Corp. v. Dixon Chem. Research, Inc., 52 N.J.Super. 143, 148-49, 145 A.2d 49 (Ch.Div.1958) (contract damages). The "remedy remains the most persuasive factor." Weinisch, 123 N.J. at 344, 587 A.2d 615. Plaintiffs are entitled to a jury trial in this action at common law for money damages, a form of action which predates any of our constitutions.
Affirmed.